507 F.2d 119
 Harold POLITE, Appellant,
v.
Donald DIEHL and Walter Lofstrom, as Individuals and as
Officers of the McKeesport Police Department.
Harold POLITE, Appellant,
v.
William RENDULIC et al.
 Nos. 72-1770, 72-2013.
 United States Court of Appeals, Third Circuit.
 Submitted Under Third Circuit Rule 12(6) May 22, 1973,
Resubmitted En Banc Sept. 13, 1974.
Decided Dec. 31, 1974.
 
 Irving M. Portnoy, Harry J. Gruener, Richard B. Springer, Litman, Litman, Harris & Specter, Pittsburgh, Pa., for appellant.
 Daniel J. Weis, Weis & Weis, Pittsburgh, Pa., for appellees.
 Appeal from the United States District Court for the Western District of Pennsylvania (D.C. Civil Nos. 71-6371, 71-7601).
 Submitted Under Third Circuit Rule 12(6) on May 22, 1973
 Before KALODNER, ALDISERT and ADAMS, Circuit Judges.
 Resubmitted En Banc Sept. 13, 1974
 Before SEITZ, Chief Judge, and KALODNER, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The primary issue on appeal in this civil rights action is whether the district court, in granting the defendants' motion for summary judgment, applied the correct statute of limitations.
 
 I.
 
 2
 On the evening of August 17, 1969, an automobile operated by Polite, the plaintiff, struck the rear of a vehicle that had stopped at a 'Stop' sign. The defendant Diehl, a McKeesport, Pennsylvania, policeman, arrived two or three minutes after the accident occurred. He transported Polite, his two children, and a girl who had been riding in the other car, to McKeesport Hospital. On Diehl's instructions, Polite's car was towed away by a private towing service.
 
 
 3
 Polite was placed under arrest at the hospital on charges of driving under the influence of liquor and disorderly conduct. Polite alleges that while he was held in custody at the police station the defendant policemen maliciously beat him and sprayed chemical mace in his eyes. Then, Polite claims, he was taken before a magistrate and forced to plead guilty to charges of disorderly conduct, resisting arrest, and failure to have a driver's license and ownership card as required by Pennsylvania law. The following morning, after a hearing, Polite was bound over on the drunken driving charge.
 
 
 4
 Approximately 23 months after Polite's arrest he filed a civil rights action against Diehl and Lofstrom. A little less than 24 months after the arrest[1] he filed another suit against Rendulic, Chancio, Hanna, Donet, Sokol and Lofstrom, alleging the same violations of his civil rights raised in the first suit. All the defendants were McKeesport policemen. The two actions were consolidated in the district court.
 
 
 5
 The complaints both alleged that the defendant policemen, 'acting in concert and under color of state law,' violated the Civil Rights Acts[2] in depriving Polite of due process of law and equal protection of the laws in that (1) 'Plaintiff was detained and incarcerated without a warrant, probable cause, explanation of the charges, explanation of his rights or the opportunity to consult with counsel;' (2) 'Plaintiff was subjected to verbal abuse and taunting (and) . . . physical abuse by the defendants in that he was repeatedly beaten, kicked, punched and while imprisoned in a cell was subjected to the application of liquid chemical mace to the eyes, all of which caused serious and severe injuries to the plaintiff,' and 'denied medical attention for the injuries received in the beatings administered by the defendants;' (3) 'By the use of threats, intimidation and interrogation was forced by the defendants to plead guilty to the charges alleged;' and (4) 'At the time of the collision the defendants, without explanation, unlawfully seized the plaintiff's vehicle.'
 
 
 6
 The defendants denied the allegations in Polite's complaints, and then filed a motion for summary judgment[3] on the ground that Pennsylvania's one-year statute of limitations for actions based on false arrest[4] barred plaintiff's suits. Polite, in reply, contended that the appropriate statute of limitations was Pennsylvania's two-year statute pertaining to suits for personal injury.[5]
 
 
 7
 Following a hearing on defendants' motion for summary judgment, the district court granted judgment in favor of the defendants in both actions. The district court construed Gagliardi v. Lynn,[6] the leading case on the scope of Pennsylvania's statute of limitations for false arrest actions, as holding that that statute 'applies to the entire course of conduct in cases involving incarceration preceded by arrest, including any incidental assault and battery.'[7] Applying the one-year false arrest statute of limitations to the entirety of Polite's complaints, the district court granted defendants' motions since more than a year had elapsed between the alleged violations of Polite's rights and the filing of the actions. These appeals followed.
 
 II.
 
 8
 Polite contends that the district court should have applied Pennsylvania's two-year statute of limitations pertaining to personal injury actions instead of the one-year statute of limitations relating to actions for false arrest. Although Polite has not challenged the district court's application of a single statute of limitations to the numerous claims raised in his complaints, we must determine whether the district court should have applied a separate statute to each cause of action.
 
 
 9
 The district court correctly applied the one-year statute of limitations to Polite's allegations of an unlawful arrest, but it erred in holding that the one-year statute extended to the assault and battery, conversion and guilty plea aspects of his actions.
 
 
 10
 Since the Civil Rights Acts contain no statute of limitations, the limitation to be applied is that which would be applicable in the courts of the state in which the federal court is sitting had an action seeking similar relief been brought under state law. Henig v. Odorioso, 385 F.2d 491 (3d Cir. 1967), cert. denied 390 U.S. 1016, 88 S.Ct. 1269, 20 L.Ed.2d 166 (1968). Consequently, this Court has held that Pennsylvania's one-year statute of limitations pertaining to suits for false arrest is applicable to federal civil rights actions for a false arrest allegedly committed in Pennsylvania. Hileman v. Kanble, 391 F.wd 596 (3d Cir. 1968); Henig v. Odorioso, supra. Accordingly, the district court did not err in applying the bar of Pennsylvania's one-year statute of limitations to the unlawful arrest aspect of Polite's actions.
 
 
 11
 Gagliardi, supra, however, affords no support for the view, adopted by the district court, that the limitations statute applicable to actions for false arrest 'applies to the entire course of conduct in cases involving incarceration preceded by arrest, including any incidental assault and battery.'[8] In Gagliardi, the only issue was whether the trial court erred in holding that the one-year false arrest statute barred an action for false imprisonment. The Pennsylvania Supreme Court, in affirming, stated that 'confinement is inextricably intertwined with an unlawful arrest,' and 'By the same token, if the false arrest involved only a touching and no confinement, and we were forced to choose between limitation statutes relating to false arrest and battery, we would opt for the former.' 446 Pa. at 150, 285 A.2d at 112.
 
 
 12
 Putting aside the fact that the latter statement was dictum, the language quoted refers only to a 'touching' or battery committed in accomplishing an arrest. The assault alleged here occurred not when the plaintiff was arrested at the hospital, but considerably later while he was being held in the police station. Therefore, since the alleged assault and battery was not 'inextricably intertwined' with the alleged false arrest, plaintiff's cause of action for assault and battery would not, under Pennsylvania law, be subsumed under the one-year statute applicable to suits for false arrest. Rather, if plaintiff had brought an analogous action in state court, that court would have applied Pennsylvania's two-year personal injury statute to the assault and battery. The district court here, therefore, must do the same. Thomas v. Howard, 455 F.2d 228 (3d Cir. 1972).
 
 III.
 
 13
 The district court dismissed plaintiff's allegations of a coerced guilty plea and the illegal seizure of plaintiff's automobile on the basis of the one-year false arrest statute of limitations. What has been said with regard to the assault and battery allegations demonstrates that the district court erred in doing so, since that alleged conduct was separable from the false arrest. The Pennsylvania statute of limitations applicable to state suits analogous to the allegation of the unlawful seizure of plaintiff's automobile is the six-year statute for actions for the recovery of goods. The state cause of action most similar to plaintiff's allegation of a guilty plea coerced by physical abuse is one for wrongful personal injury not resulting in death, to which a two-year statute is applicable.[9] The trial court therefore erred in summarily disposing of these two causes of action on the basis of the one-year false arrest statute.
 
 
 14
 Both parties to this appeal contend that plaintiff's entire complaint should be governed by a single limitations statute. Such a ruling, however, would be contrary to the holdings in Henig, supra, and Thomas, supra, that the district court must apply the same statute of limitations that a state court would apply in a state action seeking similar relief. Moreover, applying a single statute would have an anamalous result, since joining a claim for unlawful arrest with one for 'police brutality' would either extend the statute which would be applicable to the unlawful arrest or contract the statute that would be applicable to the brutality claim if plaintiff had raised only one of the claims or had raised them in separate actions.[10]
 
 IV.
 
 15
 We note that the defendants filed a supplemental motion for summary judgment on the basis that the record contained no evidence to sustain plaintiff's allegations of a coerced guilty plea or of an unlawful seizure of his automobile. Although the record in its present state may not contain sufficient averments to withstand such a motion, since there is no indication in the record that this motion was considered by or pressed in the district court and since the parties may wish to present additional facts when the question is squarely addressed, we leave that issue to be resolved upon remand.
 
 
 16
 Defendants' motions for summary judgment did not specifically raise the question whether the alleged assault, as described in the depositions, constituted grounds for relief under section 1983, nor did the briefs on this appeal deal with the issue, except in a fleeting reference.[11] Consequently, it would appear premature to address it at this time.[12]
 
 
 17
 Accordingly, the judgment of the district court granting summary judgment for the defendants on the causes of action alleging false arrest will be affirmed, but the judgment on the causes of action alleging assault and battery, a coerced guilty plea and unlawful seizure of the automobile will be reversed, and the case will be remanded to the district court for further proceedings consistent with this opinion.
 
 
 18
 KALODNER, Circuit Judge (concurring in part and dissenting in part).
 
 
 19
 I agree with the majority's holding that the district court correctly applied Pennsylvania's one-year statute of limitations to Polite's false arrest claims but erred in applying that statute to the assault and battery, conversion and guilty plea aspects of Polite's actions.
 
 
 20
 I further agree with the majority's affirmance of the Order of the district court insofar as it granted summary judgment for the defendants with respect to Polite's false arrest claims.
 
 
 21
 I dissent, however, from the reversal of the Order insofar as it granted summary judgment for the defendants as to Polite's assault and battery, coerced guilty plea, and automobile conversion claims.
 
 
 22
 The majority has taken a short cut to error in its stated reversal.
 
 
 23
 The critical threshold question by these appeals may be epitomized as follows:
 
 
 24
 Are Fourteenth Amendment rights violated when a policeman's fists give a 'black eye'* to one under arrest; otherwise stated, is infliction of a 'black eye' a 'federal case'?
 
 
 25
 The question was raised in the district court by the defendants' 'supplemental Motion for Summary Judgment' following filing of record of Polite's Deposition and his 'Pre-Trial Narrative Statement,' and its annexed 'Medical Report,' which disclosed nothing more than alleged infliction of a 'black eye' of five days' duration by the bare fists of one of the defendant-policemen.
 
 
 26
 The majority has decided to eschew deciding upon the threshold question and to 'leave that issue to be resolved upon remand' on its reasoning that 'it would appear premature to address it at this time,' because, in its view, 'there is no indication in the record that this motion was considered by or pressed in the district court'; and 'defendants' motions for summary judgment did not specifically raise the question whether the alleged assault, as described in the depositions, constituted grounds for relief under section 1983, nor did the briefs on this appeal deal with the issue, except in a fleeting reference.'
 
 
 27
 I disagree with the majority's stated views in every respect. Polite's Complaints alleged violation of his Fourteenth Amendment rights and sequential applicability of 1983, and the defendants' Answers denied violation of 'any' constitutional rights. The applicability of 1983 was squarely presented here by the briefs of Polite and the defendants. The defendants' brief specifically urged that 'the plaintiff has failed to state a cause of action under the Civil Rights Act.'
 
 
 28
 The majority has not served the judicial economy in limiting its disposition to the statutory limitations issue presented by the defendants' Motion for Summary Judgment and eschewing the substantive issue as to applicability of 1983 raised by the defendants' Supplemental Motion for Summary Judgment.
 
 
 29
 The circumstance that the district court did not decide the threshold question presented by the Supplemental Motion for Summary Judgment is of no for Summary Judgment is of no consequence. Nor is it of critical significance that the district court erred in premising its grant of summary judgment in favor of the defendants with respect to Polite's assault and battery and conversion allegations on Pennsylvania's one-year false arrest statute of limitations. It is settled that an appeal brings up the ultimate question whether a judgment below is right or wrong, and an appellate court may affirm the judgment if found to be correct, although based on incorrect reasoning. United States v. Rose, 346 F.2d 985, 989 (3d Cir. 1965), cert. denied, 382 U.S. 979, 86 S.Ct. 551, 15 L.Ed.2d 469 (1966).
 
 
 30
 The facts giving rise to plaintiff's actions may be highlighted as follows:
 
 
 31
 On the evening of August 17, 1969, at about 6:30 p.m., an automobile operated by Polite, in which his two young children were passengers, ploughed into the rear of an automobile which had stopped at an intersection in compliance with a 'Stop' warning sign.
 
 
 32
 The defendant Diehl, a McKeesport, Pennsylvania policeman, arrived at the scene of the accident two or three minutes after it occurred. He transported Polite, his two children, and a girl who had been riding in the struck car, to McKeesport Hospital. One of Polite's children was then suffering from a bleeding nose occasioned by the collision. Polite's car, which had sustained a smashed radiator, was towed away by a private towing service on Diehl's instructions.
 
 
 33
 Polite was placed under arrest at the hospital for alleged driving under the influence of liquor and disorderly conduct. He was taken to the police station about 7 p.m. He was given a hearing before a magistrate several hours later on charges of disorderly conduct, resisting arrest, and failure to have a driver's license and ownership card as required by Pennsylvania law. The magistrate fined Polite $205.00 and imposed costs of $15.00. Polite paid the fines and costs.
 
 
 34
 Polite was given a hearing on the drunken driving charge the next morning before the same magistrate. He was bound over under bond of $1,000.00 for action by the grand jury and released from custody. The grand jury later failed to indict Polite.
 
 
 35
 On July 8, 1971, Polite filed a civil rights action against the defendants at Appeal No. 72-1770. He filed his action on August 11, 1971 against the defendant policemen at Appeal No. 72-2013. The first action came almost 23 months after Polite's arrest on August 17, 1969; the second action almost two years later. The actions were consolidated below.
 
 
 36
 The complaints alleged in relevant part that the defendant policemen, 'acting in concert and under color of state law,' violated the Civil Rights Acts in depriving Polite of the due process of law and equal protection of the laws guarantees of the Fourteenth Amendment in that (1) 'Plaintiff was detained and incarcerated without a warrant, probable cause, explanation of the charges, explanation of his rights or the opportunity to consult with counsel,' and 'By use of threats, intimidation and interrogation was forced by the defendants to plead guilty to the charges alleged'; (2) 'Plaintiff was subjected to verbal abuse and taunting (and) . . . physical abuse by the defendants in that he was repeatedly beaten, kicked, punched and while imprisoned in a cell was subjected to the application of liquid chemical mace to the eyes, all of which caused serious and severe injuries to the plaintiff,' and 'denied medical attention for the injuries received in the beatings administered by the defendants'; and (3) 'At the time of the collision the defendants without explanation unlawfully seized the plaintiff's vehicle.'
 
 
 37
 The defendants filed timely Answers in which they denied the allegations in Polite's complaints.
 
 
 38
 Polite took depositions in August 1971 of Diehl; Kenneth Carroll, Records Custodian of the McKeesport Police Department; and Esther and Rosemary Oros, driver and passenger, respectively, of the struck car.
 
 
 39
 Polite's deposition was taken by the defendants in August 1971.
 
 
 40
 All of the depositions taken were filed on September 29, 1971.
 
 
 41
 Polite's 'Pre-Trial Narrative Statement' was filed on January 6, 1972. The 'Medical Report' of Dr. Philip C. Grana, an opthalmologist, was attached to, and made part of it. The defendants' 'Pre-Trial Narrative Statement' was filed on March 15, 1972. A pre-trial conference was had on March 24, 1972.
 
 
 42
 On April 5, 1972, defendants filed a Motion for Summary Judgment, under Rule 56, Fed.R.Civ.P., on the ground that Pennsylvania's false arrest one-year statute of limitations barred plaintiff's actions. Polite, in reply, contended that the appropriate statute of limitations was Pennsylvania's two-year statute of limitations pertaining to suits for personal injury.
 
 
 43
 On May 1, 1972 the defendants filed a 'Supplemental Motion for Summary Judgment' on the prevailing record.
 
 
 44
 The district court entered judgments in favor of the defendants in both actions in a 'Memorandum and Order' filed July 7, 1972, following a hearing that day on their 'Motion for Summary Judgment.'
 
 
 45
 In doing so it held that the Pennsylvania one-year statute of limitations extended to all aspects of Polite's actions.
 
 
 46
 The instant appeals followed.
 
 
 47
 What has been said brings me to the threshold question:
 
 
 48
 Are Fourteenth Amendment rights violated when a policeman's fists give a 'black eye' to one under arrest; otherwise stated, is infliction of a 'black eye' a federal case?
 
 
 49
 That Polite suffered no more than a commonplace black eye, which 'healed,' with 'no complications,' in some five days, after treatments consisting of application of 'eye drops,' is established by the 'medical Report'[1] of his attending physician, Dr. Philip C. Grana, an ophthalmologist.
 
 The 'medical Report' discloses:
 
 50
 Polite visited Dr. Grana on August 19, 1969. He told Dr. Grana that 'he was struck in left eye (Sunday evening 8-17-69 by a policeman).' Polite's left eye was 'swollen shut.' Dr. Grana's diagnosis was 'Edema[2] left upper eye lid and left lower eye lid (Moderate).' X-rays taken at Braddock General Hospital on August 19, 1969 were 'negative for fracture.' 'Ocular examination to determine extent of injury' resulted in 'Findings normal.' 'Eye drops' were prescribed. Polite was 'discharged' August 23, 1969, with notation-- 'Eye healed-- no complications.'
 
 
 51
 The 'Medical Report' concluded with these statements: 'Cost of medical treatment to date $27.00. Estimated cost of future medical treatment None.'
 
 
 52
 It may be noted parenthetically that Polite stated in his filed deposition that he had not seen any physician following his discharge by Dr. Grana, and that 'Plaintiff's Pre-Trial Narrative Statement' lists as sole medical expenses Dr. Grana's fee of $27.00 and $15.00 paid to Braddock General Hospital for X-rays.
 
 
 53
 Polite's deposition, insofar as it related to his allegations that he 'was subjected to physical abuse by the defendants . . . and to the application of liquid chemical mace to the eyes,'[3] may be summarized as follows:
 
 
 54
 He was struck and knocked down by officer Rendulic while he was in the police station; Rendulic and other unidentified policemen dragged him to a cell where Rendulic 'sprayed mace in my eyes' and 'hit me in my eyes'; Polite's face was not bruised, there was 'just swelling'; Rendulic only used 'his fists'; 'he didn't hit me with any club or blackjack . . . or gun or anything'; Rendulic did not 'kick' him; officer Diehl 'didn't' hit Polite, nor use mace on him, nor hold him while he was being hit by Rendulic; Polite didn't identify the officers who allegedly held him while he was being attacked by Rendulic, nor did he say that any other policeman had struck him.
 
 
 55
 The distilled essence of Polite's deposition testimony is that Rendulic, using only his fists, 'hit me in my eyes,' and 'sprayed mace in my eyes.' The distilled essence of Dr. Grana's Medical Report is that Polite suffered a commonplace balck eye which completely healed in five days after application of eye drops. Taken together they make out a case of 'simple battery' which is defined as 'Any unlawful beating, or other wrongful physical violence or constraint, inflicted on a human being without his consent . . . not accompanied by circumstances of aggravation, or not resulting in grievous bodily injury.'[4]
 
 
 56
 I am of the opinion that standing alone, an ordinary assault and battery committed by a policeman upon one under arrest does not violate Fourteenth Amendment guarantees,[5] and thus does not bring into play the Civil Rights Act, 42 U.S.C.A. 1983, which affords the remedy of an action at law, or suit in equity, for 'deprivation of any rights, privileges or immunities secured by the Constitution and (the) laws,'[6] or 28 U.S.C.A. 1343(3) which creates federal jurisdiction as to civil actions 'To redress the deprivation, under color of any State law, . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons . . ..'[7]
 
 
 57
 Here Polite's complaints alleged only that 'he was subjected to verbal abuse and taunting . . . (and) physical abuse by thd defendants . . . which caused serious and severe injuries to the plaintiff.' The complaints did not allege that the 'physical abuse' was administered by the defendants (1) in the course of performance of their official duties; or (2) as summary punishment in lieu of regular procedures of trial and sentence; or (3) that the alleged physical abuse amounted to 'cruel and unusual punishments' proscribed by the Eighth Amendment; or (4) that it was 'discriminatory.' The complaints state only conclusionary allegations of constitutional violations under color of state law, viz., deprivation of 'the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution.'
 
 
 58
 Polite's theory of his case is epitomized in 'Plaintiff's Pre-Trial Narrative Statement' as follows:
 
 
 59
 'During the course of his detention, the plaintiff was subjected to verbal abuse and taunting by the individual defendants. He was also subjected to physical abuse by the defendants in that he was beaten, kicked, and punched by some or all of them. While imprisoned in a cell, the plaintiff was subjected to the application of liquid chemical mace to his eyes, all of which caused him serious and severe injuries. All of the aforesaid was committed without provocation or reasonable cause.'
 
 
 60
 The sum of that theory is that any assault by a policeman on one under arrest-- irrespective of attending circumstances, the nature and degree of the assault, and its consequences-- constitutes a violation of the guarantees of the Fourteenth Amendment.
 
 
 61
 The circumstances attending the assault and its nature, degree and consequences, are respectively spelled out in Polite's deposition as follows:
 
 
 62
 Officer Rendulic, after saying 'What's wrong with this cat? . . . I'm hot and irritated already. Don't give me no hard time,' suddenly and without provocation, beat Polite with his fists, dragged him into a cell and then sprayed mace in his eyes, with resulting partial swelling of Polite's face and irritation of his eyes, of five days' duration.
 
 
 63
 Polite's deposition in sum makes out a state tort of simple assault and battery unattended by any circumstance constituting 'deprivation of any rights, privileges, or immunities secured by the Constitution and (the) laws.' 42 U.S.C.A. 1983.
 
 
 64
 Present 1983 and 1343(3) are derived from the Act of April 20, 1871, ch. 22, 1, 17 Stat. 13, entitled 'An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes.' The 1871 Act is commonly referred to as the Ku Klux Klan Act because it was spawned by Ku Klux Klan unconscionable outrages inflicted upon black citizens and Union sympathizers in the post-Civil War era, unrestrained by state law enforcement agencies and courts which were unwilling or unable to cope with Klan outlawry.
 
 
 65
 The historic background of the 1871 Act was outlined in the leading case of Monroe v. Pape, 365 U.S. 167 (1961), as follows, at pages 174-175, 81 S.Ct. 473, at page 477, 5 L.Ed.2d 492:
 
 
 66
 'This Act of April 20, 1871, sometimes called 'the third 'force bill," was passed by a Congress that had the Klan 'particularly in mind.' The debates are replete with references to the lawless conditions existing in the South in 1871. There was available to the Congress during these debates a report, nearly 600 pages in length, dealing with the activities of the Klan and the inability of the state governments to cope with it. This report was drawn on by many of the speakers. It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this 'force bill."
 
 
 67
 The significance of the historic background of 1 of the 1871 Act, was recently stressed in District of Columbia v. Carter, 409 U.S. 418 (1973), in this statement at page 425, 93 S.Ct. 602, at page 607, 34 L.Ed.2d 613:
 
 
 68
 'Any analysis of the purposes and scope of 1983 must take cognizance of the events and passions of the time at which it was enacted. After the Civil War ended in 1865, race relations in the South bacame increasingly turbulent. The Ku Klux Klan was organized by southern whites in 1866, and a wave of murders and assaults was launched against both blacks and Union sympathizers.'
 
 
 69
 Prior to enactment of the 1871 Act, state courts had sole jurisdiction with respect to actions seeking vindication of fundamental rights secured by the federal Constitution and laws, since there then existed no general federal-question jurisdiction in the lower federal courts,[8] in light of the fact that 'Congress relied on the state courts to vindicate essential rights arising under the Constitution and federal laws.'[9]
 
 
 70
 In the interval between July 28, 1868, when the Fourteenth Amendment became effective, and the enactment of the 1871 Act, state courts in the main failed to give effect to the Amendment whose main purpose was to establish the citizenship of emancipated negroes and thereby sequentially extend to them enjoyment of the guarantees of the Amendment. In numerous instances, state courts also failed to afford the protection of state constitutions and state laws to aggrieved citizens.
 
 
 71
 As indicated by its title, the 1871 Act was enacted to open the doors of the federal judicial system to citizens deprived of fundamental rights under color of state law by creating (1) a right to bring an action at law or in equity for vindication of fundamental guarantees, and (2) federal jurisdiction to entertain such an action. As earlier stated, present sections 1983 and 1343(3), derived from 1 of the 1871 Act, respectively afford the federal remedy and jurisdiction.
 
 
 72
 The 'several purposes' of the 1871 Act were highlighted in Monroe v. Pape, supra, 365 U.S. at 173-174, 81 S.Ct. at 477, as follows:
 
 
 73
 'The legislation . . . had several purposes . . ..
 
 
 74
 'First, it might . . . override certain kinds of state laws . . ..
 
 
 75
 'Second, it provided a remedy where state law was inadequate . . ..
 
 
 76
 'Third . . . to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice.'
 
 
 77
 In elaboration of the foregoing, the Court further said at page 180, 81 S.Ct. at 480:
 
 
 78
 'It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies.'
 
 
 79
 The holding in Monroe v. Pape, supra, was recently epitomized in Moor v. County of Alameda, 411 U.S. 693 (1973), in this capsule statement at page 699, 93 S.Ct. 1785, at page 1790, 36 L.Ed.2d 596:
 
 
 80
 'There the Court held that 42 U.S.C. 1983, which was derived from 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13, was intended to provide private parties a cause of action for abuses of official authority which resulted in the deprivation of constitutional rights, privileges, and immunities.'
 
 
 81
 The gamut of 1983 was articulated in Mitchum v. Foster, 407 U.S. 225 (1972), as follows, at pages 238-239, 92 S.Ct. 2151, at page 2160, 32 L.Ed.2d 705:
 
 
 82
 'Section 1983 was originally 1 of the Civil Rights Act of 1871. 17 Stat. 13. It was 'modeled' on 2 of the Civil Rights Act of 1866, 14 Stat. 27, and was enacted for the express purpose of 'enforcing the Provisions of the Fourteenth Amendment.' 17 Stat. 13. The predecessor of 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment. As a result of the new structure of law that emerged in the post-Civil War era-- and especially of the Fourteenth Amendment, which was its centerpiece-- the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established. . . . Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.'
 
 
 83
 The Supreme Court has specifically held that 1983, like the Fourteenth Amendment which is its centerpiece, 'is of only limited scope' reaching only 'deprivations of rights' under color of state law and not 'purely private conduct.' In doing so, it said in District of Columbia v. Carter, supra, 409 U.S. at pages 424-425, 93 S.Ct. at page 606:
 
 
 84
 'Like the Amendment upon which it based, 1983 is of only limited scope. The statute deals only with those deprivations of rights that are accomplished under the color of the law of 'any State or Territory.' It does not reach purely private conduct and, with the exception of the Territories, actions of the Federal Government and its officers are at least facially exempt from its proscriptions.'
 
 
 85
 This Court has taken cognizance of the limited scope of 1983, in holding that improper medical treatment of a state prisoner is not a deprivation of fundamental rights secured by the federal Constitution and laws,[10] and that the same is true with respect to a denial to a state prisoner of necessary medical treatment for an ear infection.[11] We have further ruled that a state prisoner's complaint which alleged that he was compelled to work on a press which was dangerous and unfit, failed to state a 1983 cause of action. In doing so we held that a tort committed by a state official acting under color of state law is not 'in and of itself, sufficient to show an invasion of a person's right under the (1983) Act.'[12]
 
 
 86
 The rationale of our stated view was later explicated in Howell v. Cataldi, 464 F.2d 272 (3d Cir. 1972), where our brother Aldisert, speaking for the Court, said at page 278:
 
 
 87
 'It becomes important to delineate that conduct which is actionable in state courts as a tort, and that which is actionable in federal courts under 1983. The two rights of action do not always stand in pari materia. Some common law and statutory torts, although actionable in a state forum, although actionable in a state forum, do not rise to constitutional dimensions. The converse is equally true. Conduct may be actionable as a deprivation of constitutional rights where no force and violence has been utilized, and there exists no orthodox counterpart of state common law or statutory relief available.'
 
 
 88
 We emphasized that 'recovery under 1983 is strictly limited to deprivations under the federal constitution and federal law,' in Smith v. Spina, 477 F.2d 1140, 1144 (3d Cir. 1973). We there held that 1983 did not subsume state tort causes of action based on theories of negligence, res ipsa loquitur, and intentional assault and battery.
 
 
 89
 In United States v. Delerme, 457 F.2d 156 (3d Cir. 1972), where we held that a policeman violated due process of law guarantees in 'administering a physical beating as punishment for a traffic violation,' we said at page 161:
 
 
 90
 'We do not . . . intimate that every assault by a police officer or official of a state or territory ipso facto transfers a state offense to an offense of constitutional dimensions under 18 U.S.C. 242 (the criminal counterpart of 1983).'
 
 
 91
 We recently held that an issue of due process deprivation within the ambit of 1983 was presented in a prisoner's complaint which alleged that defendant prisoner guards had 'stopped him from defending himself' when he was attacked by a fellow convict with a knife with resulting loss of an eye. Curtis v. Everette, 489 F.2d 516, 517 (3d Cir. 1973), cert. denied, 416 U.S. 995, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).
 
 
 92
 It is imperative to note at this point that the Supreme Court has not passed on the issue whether an assault and battery, simple or aggravated, per se, affords a 1983 remedy, when it is committed under color of state law on one in custody.
 
 
 93
 The courts of appeals and district courts have ruled on the issue with divergent results without an equivalent amount of analysis of Supreme Court cases, later discussed, which they have cited in support of their dispositions, viz., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); and United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).
 
 
 94
 An analysis of the cited Supreme Court cases, and the oft-cited Crews v. United States, 160 F.2d 746 (5th Cir. 1947), will be prefaced by discussion of circuit court assault cases which have denied or sanctioned application of 1983.
 
 
 95
 In Cole v. Smith, 344 F.2d 721 (8th Cir. 1965), the Court affirmed the dismissal of a 1983 complaint which alleged that the plaintiff, a prisoner, had suffered 'scars, a partial loss of hearing, and a disfigured ear' as a result of an assault by employees of the Minnesota Security Hospital. 344 F.2d at 723.
 
 
 96
 In doing so, the Court said at pages 723-724:
 
 
 97
 'The Civil Rights Act . . . provides in pertinent part protection to an individual who is deprived of constitutionally protected rights under color of state law. It is now well settled that a right so violated must be a 'federal right,' i.e. a right protected by the Constitution or laws of the United States, for the violation of which a complaint may, in proper cases, be made under color of state law, rather than one arising from individual wrongs of private citizens one to another . . ..
 
 
 98
 'Therefore, the real matter for consideration by us in this appeal is whether the alleged assaults which appellant asserts . . . were of such nature as to deprive him of a constitutional right under color of state law, as opposed to assaults of a private nature by individuals, not constitutionally so protected. If the assaults . . . did in fact occur, they could possibly be violative of some state law, but 'the problem' confronting us 'is not whether state law has been violated,' but rather whether a constitutional right has been violated.'In Davis v. United States, 439 F.2d 1118 (8th Cir. 1971), a 1983 complaint of a city jail inmate alleged that his eyes and nasal passages were affected when tear gas used by jail officers in quelling a disturbance in the exercise area of the jail penetrated into the prisoner's cell.
 
 
 99
 In affirming the district court's dismissal of the complaint the Court said at pages 1119-1120:
 
 
 100
 'The allegations of the complaint fall short of stating a claim for relief for deprivation of a protected constitutional right. Stripped of all the non-essential verbage, the complaint shows that appellant was caused to come into contact with tear gas used by the jail officers in quelling the disturbance in the prison. Even if this constituted an assault, it was insufficient to sustain an action for relief under the civil rights statute, Cole v. Smith, 344 F.2d 721, 724 (8th Cir. 1965).'
 
 
 101
 It may be noted that retired Supreme Court Justice Tom C. Clark was, by special designation, a member of the panel in Davis.
 
 
 102
 In Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), subsequently reversed on other grounds in District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), it was held that a complaint which alleged that the plaintiff was arrested without probable cause and beaten with brass knuckles by one Carlson, a policeman, sufficiently alleged a cause of action against the policeman under 1983. In so holding, the Court said at page 363:
 
 
 103
 'An arrest without probable cause, or an arrest made with excessive force, constitutes an unreasonable seizure in violation of the Fourth Amendment.'
 
 
 104
 A divided Second Circuit Court recently held in Johnson v. Glick, 481 F.2d 1028, 1029, (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), that a claim cognizable under 1983 was stated by a complaint which alleged that one Fuller, a House of Detention officer, in an unprovoked attack on the plaintiff, 'struck him twice on the head with something enclosed in the officer's fist,' and harassed plaintiff by unduly detaining him for several hours before permitting him to see a doctor. The complaint further alleged that plaintiff has since 'been having terrible pains in his head.' Id. at 1029-1030.
 
 
 105
 In so holding, the Court said in relevant part at page 1032:
 
 
 106
 'Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law. If Rochin suffered such a violation of his constitutional rights by the police as to be entitled to invalidation of a conviction obtained as a consequence, he also was the victim of a violation sufficient to sustain an action under the Civil Rights Act . . ..'
 
 
 107
 Judge Moore, in a dissenting opinion, disagreed with the majority's 'police brutality' categorization of Fuller's conduct. He pointed to the majority's statement that the complaint 'alleged a single, spontaneous incident,' and said with respect to it that the allegations as to 'a few blows to plaintiff' did not constitute deprivation of due process. 481 F.2d at 1034-1035.
 
 
 108
 The Fourth Circuit, in Jenkins v. Averett, 424 F.2d 1228 (1970), held that a white policeman who shot and wounded an 18-year old negro, in flight from the scene of a street brawl, was liable in a 1983 action for damages.
 
 
 109
 In reversing the district court's holding that albeit the plaintiff was subjected to reckless use of excessive force, his right of recovery was limited to his pendent state claim, the Court said at page 1232:
 
 
 110
 'Injuries arbitrarily inflicted by the police are constitutionally cognizable and remediable.'
 
 
 111
 It must be noted that the Court held the Fourth Amendment to be applicable, citing its guarantee of 'the right of the people to be secure in their persons . . . against unreasonable searches and seizures.' In doing so, it stated 'It is likewise clear that this shield covers the individual's physical integrity.' 424 F.2d at 1232.
 
 
 112
 The Fifth Circuit held in Tolbert v. Bragan, 451 F.2d 1020 (1971), that a 1983 cause of action was presented in a prisoner's complaint which alleged 'five jailers beat him severely about the head and body with blackjacks, leaving him badly injured,' and that the assault was 'racially motivated.'
 
 
 113
 In reversing the district court's dismissal of the complaint, the Court, without adverting to the 'racially motivated' allegations, held:
 
 
 114
 'Severe physical abuse of prisoners by their keepers without cause or provocation is actionable under the Civil Rights Act.'
 
 
 115
 The Court cited only circuit court cases in support of the stated holding.
 
 
 116
 The Seventh Circuit, citing Screws v. United States, supra, held in Collum v. Butler, 421 F.2d 1257, 1259 (1970), that where an arrested motorist was severely beaten by policemen, that use of force by the police which is 'unreasonable and unnecessary' violates the 'constitutional right of due process.'
 
 
 117
 The same Circuit, however, cited and relied upon Monroe v. Pape, supra, in Hardwick v. Hurley, 289 F.2d 529 (1961), where it held that a 1983 claim was presented by a complaint which alleged that the plaintiff, in violation of the Fourteenth Amendment, had been beaten, stomped and kicked following his arrest in punishment for his refusal to take a drunken driving test.
 
 
 118
 The Ninth Circuit, in Wiltsie v. California Department of Corrections, 406 F.2d 515 (1968), held that a civil rights action was presented in a prisoner's complaint which alleged six prison guards had beaten him with fists and billyclubs on his head, shoulder, ribs, spinal column and buttocks, and that he may suffer permanent disability as a result of his injuries.
 
 
 119
 It merits observation that after reference to circuit court cases, the Court cited, at page 517, 'As additional precedent for our ruling,' United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), where the Supreme Court sustained indictments under the criminal provisions of the Civil Rights Act which charged that the defendants, private citizens, acting in cahoots with state officials, had killed three civil rights activists as 'punishment.'
 
 
 120
 The Ninth Circuit cited and applied Monroe v. Pape, supra, in Dodd v. Spokane County, Washington, 393 F.2d 330 (1968), where the complaint, without further specification, alleged that the plaintiff prisoner was beaten, by the six defendants, under color of state law, as 'punishment' for refusal to testify against an accused in a criminal trial, and in Brown v. Brown, 368 F.2d 992, cert. denied, 385 U.S. 868, 87 S.Ct. 133, 17 L.Ed.2d 95 (1966), where the prisoner's complaint alleged that he had been 'beat(en), kicked, knocked, stomped, thrashed, and cursed' by three unnamed 'agents of the San Quentin Prison,' acting under instructions of the defendant Governor of California and Warden of San Quentin Prison, in an effort to 'coerce' the plaintiff into 'making a statement about another case of their interest' and to exact his confession of involvement in other crimes. 368 F.2d at 993-994 n. 2.
 
 
 121
 The Tenth Circuit held in Bethea v. Crouse, 417 F.2d 504 (1969), Circuit Judge Seth dissenting, that an issue of cruel and unusual punishment, violative of the Eighth Amendment was presented by a prisoner's complaint which alleged that he had been kicked, and beaten about the face, head, and body, and had been 'knocked around a number of times' by another prisoner without interference by prison officials. Id. at 508.
 
 
 122
 In doing so, it said in relevant part at page 509:
 
 
 123
 'Taking the prisoners' version, we must conclude . . . that the alleged mistreatment amounts to cruel and unusual punishment.'In defining the test to be applied in determining whether the force used against a prisoner amounted to cruel and unusual punishment, the Court said at page 509:
 
 
 124
 'The ultimate issue is whether the assault as found by the factfinder is sufficiently severe in the circumstances to shock the conscience of a reasonable man.'
 
 
 125
 It must immediately be noted that in an earlier case, Morgan v. Labiak, 368 F.2d 338 (1966), where police officers 'used their night sticks to dislodge . . . from his property' one who had been arrested for breach of the peace, the Tenth Circuit, citing Screws v. United States, supra, held:
 
 
 126
 'A person unlawfully beaten by an arresting officer is denied the right of due process of law, . . . (and) it was a question for the jury whether or not the force was unnecessary, unreasonable or violent, . . . (and) 'the reasonableness of the force used in making an arrest under all the circumstances is a question of fact for the jury, and the standard is the conduct of ordinary, prudent men under the existing circumstances." 368 F.2d at 340.
 
 
 127
 What has been said brings me to a discussion, in chronological order, of the Supreme Court cases, which as earlier stated, have been cited without equivalent analysis in the foregoing circuit court dispositions.
 
 
 128
 In United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), it was held that 19 and 20 of the Criminal Code, 18 U.S.C.A. 51, 52, present 241, 242, 18 U.S.C.A., (criminal counterparts, respectively, of 1985(3), and 1983, 42 U.S.C.A.), permitted a criminal prosecution for violations of 'rights' 'secured' to qualified voters by Article I, 2 of the Constitution, in a Louisiana primary election for nomination of candidates for the United States Congress.
 
 In so holding, the Court said:
 
 129
 'The right of the voters at the primary to have their votes counted is, as we have stated, a right or privilege secured by the Constitution, and to this 20 also gives protection. The alleged acts of appellees were committed in the course of their performance of duties under the Louisiana statute requiring them to count the ballots, to record the result of the count, and to certify the result of the election. Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.' 313 U.S. at 325-326, 61 S.Ct. at 1043.
 
 
 130
 In Screws v. United States, 325 U.S. 91, 93, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), two law enforcement officers were found guilty on a 20 indictment of the Criminal Code which charged them with 'willfully' depriving one Hall, a 30-year old negro, of his Fourteenth Amendment right 'not to be deprived of life without due process of law' when they beat him to death, in effecting his arrest.
 
 
 131
 The Supreme Court reversed the defendants' conviction on the ground that the trial court had failed to properly instruct the jury that in order to convict, they were required to find that the defendants 'had the purpose to deprive the prisoner of a constitutional right, e.g., the right to be tried by a court rather than by ordeal.' 325 U.S. at 107, 65 S.Ct. at 1038.
 
 
 132
 In doing so it rejected the defendants' contention that 20[13] is unconstitutional insofar as it makes criminal acts in violation of the due process clause of the Fourteenth Amendment because it provides no ascertainable standard of guilt in light of the broad and fluid definitions of due process and their inherent uncharted potential.
 
 
 133
 Of critical significance is the fact that in holding 20 constitutional the Court construed it to extend only to acts committed with the intent to deprive a person of a right made specific (1) by the express terms of the Constitution; or (2) federal laws; or (3) by pre-existing decisions interpreting the Constitution.
 
 
 134
 In doing so the Court stated in relevant part:
 
 
 135
 'The specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them . . .. He who defies a decision interpreting the Constitution knows precisely what he is doing . . .. Of course, willful conduct cannot make definite that which is undefined. But willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they have no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite. When they are convicted for so acting, they are not punished for violating an unknowable something.' 325 U.S. at 104-105, 65 S.Ct. at 1037.
 
 
 136
 It must be noted that in limiting application of the due process clause in 20 cases to 'defined' concepts of due process extant at the time of the alleged violation of the section, the Court said:
 
 
 137
 'We take the course which makes it possible to preserve the entire Act and save all parts of it from constitutional challenge. If Congress desires to give the Act wider scope, it may find ways of doing so. Moreover, here as in Apex Hosiery Co. v. Leader, 310 U.S. 469 (60 S.Ct. 982, 84 L.Ed. 1311), we are dealing with a situation where the interpretation of the Act which we adopt does not preclude any state from punishing any act made criminal by its own laws. Indeed, the narrow construction which we have adopted more nearly preserves the traditional balance between the States and the national government in law enforcement than that which is urged upon us.' 325 U.S. at 105, 65 S.Ct. at 1037.
 
 
 138
 In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), six negro children and their parents filed a 1983 complaint against the City of Chicago and 13 of its police officers in which they alleged invasion of their home and search without a warrant, and the arrest and detention of the male parent without a warrant and without arraignment.
 
 
 139
 The district court dismissed the complaint on its holding that (1) it failed to allege a 1983 cause of action against the policemen, and (2) the City of Chicago was not liable under 1983. The court of appeals affirmed and certiorari was granted.
 
 
 140
 The Supreme Court affirmed the dismissal as to the City of Chicago on the ground that 'congress did not undertake to bring municipal corporations within the ambit' of 1983. 365 U.S. at 187, 81 S.Ct. at 484. It reversed the dismissal as to the 13 policemen on its holding that the allegation of facts constituting a deprivation, under color of state authority, of the guarantee against unreasonable searches and seizures, contained in the Fourth Amendment and made applicable to the states by reason of the due process clause of the Fourteenth Amendment, satisfied the requirements of 1983.
 
 
 141
 After noting that 'The word 'wilfully' does not appear in 1979 (1983)' and thus there is no requirement of proof of intent to deprive a person of a federal right in a 1979 action, the Court made this oft-quoted statement:
 
 
 142
 'Section 1979 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' 365 U.S. at 187, 81 S.Ct. at 484.
 
 
 143
 In light of its frequent citation in civil rights cases, I must also refer to Crews v. United States, 160 F.2d 746 (5th Cir. 1947), a pre-Monroe case.
 
 
 144
 There, the defendant Crews, a town marshal and constable took one McFadden into custody, placed him in a car driven by Crews' nephew, beat him with a bull whip, and then drove him some thirty miles to a bridge, where, 'notwithstanding McFadden's protestations that he could not swim, . . . forced him to jump from the high bridge into the deep, swift current of the river, from which he never came out until he was taken from the water and the willows by the undertaker.' 160 F.2d at 748.
 
 
 145
 Crews was found guilty by a jury on an indictment charging him with violation of 20 of the Criminal Code. He contended in his appeal that the evidence failed to show he was acting under color of law. The Fifth Circuit rejected that contention and affirmed his conviction, citing Screws v. United States, supra.
 
 
 146
 In brief resume, Classic dealt only with violation of rights secured by Article I, 2 of the Constitution relating, inter alia, to the right of the people to choose Representatives to the Congress of the United States; Screws held that the killing of a negro by three law enforcement officers violated the due process clause of the Fourteenth Amendment; and Monroe held that a search of a home without a warrant violated the Fourth Amendment proscription against 'unreasonable searches and seizures,' thereby violating the due process clause of the Fourteenth Amendment.
 
 
 147
 Classic and Monroe have in the main been cited in support of holdings that a custodial assault violates Fourteenth Amendment guarantees, albeit no circumstance of assault or use of force was adverted to in the Court's opinion in either case.
 
 
 148
 The genesis of their citation is the statement in Classic that 'Misuse of power, possessed by virtue of state law . . . is action taken 'under color of' state law,'[14] and the statement in Monroe that 'Section 1979 (1983) should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'[15]
 
 
 149
 The courts resorting to these statements have failed to take into account the context in which they were made.
 
 
 150
 Classic's 'misuse of power' statement was made in the context of the Court's definition of the 'under color of state law' provision in the criminal counterpart of 1983, in rejecting the defendants' contention that they were not acting under color of state law in their fraudulent conduct of a primary election.
 
 
 151
 Monroe's statement that Section 1983 'should be read against the background of tort liability,' etc. was made in the context of the Court's holding that while the criminal counterpart of 1983 requires proof of an intent to deprive a victim of police action of a constitutional right, 1983 does not require proof of such an intent.[16]
 
 
 152
 It may be added that the assault cases which have cited Screws have overlooked the fact that it only decided that the beating to death of an arrested man by law enforcement officers was a 'trial by ordeal' in lieu of a trial by jury, in violation of the due process clause.
 
 
 153
 What has been said brings me to the overriding critical issue whether custodial assaults under color of state law violate the Fourteenth Amendment's 'privileges and immunities'; 'equal protection of the laws'; or 'due process' guarantees, so as to bring into play 1983, derived from the Civil Rights Act of April 20, 1871, which, as its title declares, was enacted to enforce the provisions of the Fourteenth Amendment.
 
 
 154
 Since the Fourteenth Amendment is the centerpiece of 1983, ascertainment of the meaning and sweep of the Amendment's guarantees are critical to application of the statute.
 
 
 155
 Section 1 of the Fourteenth Amendment, after stating that 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside,' provides:
 
 
 156
 'No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'
 
 
 157
 The 'privileges or immunities' clause of the Fourteenth Amendment is not a basis for the exercise of federal power in the protection of individual rights against state action since it protects only rights of national citizenship. It was so expressly held more than a century ago in the historic Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), where it was stressed that the Fourteenth Amendment provides that 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' and thus 'speaks only of privileges and immunities of citizens of the United States, and does not speak of those of citizens of the several States.' 83 U.S. at 74.[17]
 
 
 158
 Later Supreme Court cases have consistently followed Slaughter-House, in construing the Amendment's privilege and immunity clause to protect only interests growing out of the relationship between citizens of the United States and the national government.
 
 
 159
 In doing so, the leading case of Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), said with respect to Slaughter-House:'The distinction between national and state citizenship and their respective privileges there drawn has come to be firmly established.' 211 U.S. at 96, 29 S.Ct. at 18.[18]
 
 
 160
 In Snowden v. Hughes, 321 U.S. 1 (1944), where 1983 was invoked, the Court citing, inter alia, Slaughter-House, said at pages 6-7, 64 S.Ct. 397, at page 400, 88 L.Ed. 497:
 
 
 161
 'The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law.'
 
 
 162
 The 'equal protection of the laws' clause does not require extended discussion.
 
 
 163
 The Supreme Court, has time and again, limited its application to cases of 'intentional and purposeful' 'invidious discrimination.'
 
 
 164
 The reach of the clause was tersely epitomized by Mr. Justice Douglas, speaking for the Court in Williamson v. Lee Optical Co., 348 U.S. 483 (1955), in this statement at page 489, 75 S.Ct. 461, at page 465, 99 L.Ed. 563:
 
 
 165
 'The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.'
 
 
 166
 In Snowden v. Hughes, supra, the Court said with respect to application of the clause:
 
 
 167
 'The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.' 321 U.S. at 8, 64 S.Ct. at 401.
 
 
 168
 See too Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Hunter v. Erickson, 393 U.S. 385, 391-392, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); Loving v. Virginia, 388 U.S. 1, 10, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 81, 21 L.Ed. 394 (1873).
 
 
 169
 I come now to the due process clause of the Fourteenth Amendment which provides:
 
 
 170
 'Nor shall any State deprive any person of life, liberty, or property, without due process of law . . ..'
 
 
 171
 The due process clause has been summarily applied by lower federal courts in the majority of 1983 custodial assault, 'hair' and 'dress' cases, without equivalent analysis of the meaning and usage of 'due process' at the time the clause was incorporated into the Fourteenth Amendment which became effective July 28, 1868, or, of the earlier recited historic setting of the Fourteenth Amendment and the Civil Rights Act of April 20, 1871, from which 1983 is derived.
 
 
 172
 This summary carte blanche application of the due process clause has been in disregard of these settled principles:
 
 
 173
 (1) A constitutional provision "must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution," and, 'In ascertaining the meaning of the phrase taken from the Bill of Rights it must be construed with reference to the common law from which it is taken.' Kepner v. United States, 195 U.S. 100, 126, 24 S.Ct. 797, 808, 49 L.Ed. 114 (1904).
 
 
 174
 (2) Courts in construing the due process clause of the Fourteenth Amendment 'have the authority to take into account only those fundamental rights which are expressed in that provision,' and in determining 'whether the right is so fundamental in due process that a refusal of the right is a denial of due process,' courts must 'inquire how the right was rated during the time when the meaning of due process was in a formative state, and before it was incorporated in American constitutional law.' Twining v. New Jersey, 211 U.S. 78, 107, 29 S.Ct. 14, 23, 53 L.Ed. 97 (1908).
 
 
 175
 (3) 'Due process,' at the time it was incorporated in the Fourteenth Amendment encompassed and embodied only those 'principles of liberty' and 'justice so rooted in the traditions and conscience of our people as to be ranked fundamental.' Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934); Hebert v. Louisiana, 272 U.S. 312, 316, 47 S.Ct. 103, 71 L.Ed. 270 (1926); Twining v. New Jersey, supra.
 
 
 176
 (4) 'It was not intended by the Fourteenth Amendment and the Civil Rights Acts that all matters formerly within the exclusive cognizance of the states should become matters of national concern.' Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 403, 88 L.Ed. 497 (1941).
 
 
 177
 Because no specific of the Constitution, the Bill of Rights, or the Fourteenth Amendment provides guarantees against assaults, per se, many litigants have invoked the due process clause in 1983 custodial assault cases, simply as a device to obtain federal jurisdiction in what has been traditionally a matter for the state courts under state tort law.
 
 
 178
 As earlier stated, the Supreme Court has not passed on the issue whether a custodial assault, standing alone, violates a constitutional right, due process, or otherwise, within the meaning of 1983.
 
 
 179
 It has only held that a custodial assault which results in death violates the due process right to 'life,' Screws v. United States, supra, and that a 'brutal' custodial assault to force a confession violates the due process clause of the Fourteenth Amendment. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951).
 
 
 180
 It is of imperative significance that the Court stressed in Williams that 'The trial judge in his charge to the jury . . . made clear that the defendants were 'not here on trial for a violation of any law of the State of Florida for assault' nor 'for assault under any laws of the United States." 341 U.S. at 104, 71 S.Ct. at 580.
 
 
 181
 Federal circuit and district courts appear to have inadvertently fashioned a new species of what may be termed 'constitutional tort' in holding that a custodial assault, standing alone, violates the due process clause of the Fourteenth Amendment.
 
 
 182
 They have, in simple essence, judicially amended the due process clause by extending its guarantees to custodial assaults, per se, and further sequentially judicially legislated an extension of the sweep of 1983 by making it applicable to custodial assaults per se.
 
 
 183
 Judicial amendment of the Constitution and its Amendments is violative of Article V of the Constitution which provides in relevant part that 'The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, . . . when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof . . ..'
 
 
 184
 Judicial legislation contravenes Article I, 1 of the Constitution which reserved to the Congress the power to legislate. American Dredging Co. v. Local 25, AFL-CIO, 338 F.2d 837, 850 (3d Cir. 1964), cert. denied, 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965).
 
 
 185
 Johnson v. Glick, supra, affords a striking instance of judicial amendment of the due process clause and sequential judicial legislation with respect to 1983.
 
 
 186
 There, the Court, in implicit recognition of the fact that the Bill of Rights (including the due process clause) does not provide a guarantee against assaults, per se, custodial or otherwise, nevertheless held:
 
 
 187
 'Quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law.' 481 F.2d at 1032.
 
 
 188
 Johnson judicially legislated an extension of 1983 when it held it applicable to rights 'apart from any 'specific' of the Bill of Rights,' in light of the fact that 1983 is applicable only to violation 'of any rights, privileges, or immunities secured by the Constitution and laws.' Neither 'the Constitution,' as presently amended, nor 'the laws' provide a guarantee against an assault, per se, 'under color' of state law, or otherwise.
 
 
 189
 Johnson's holding disregards this significant caution in Twining v. New Jersey, supra:
 
 
 190
 'Under the guise of interpreting the Constitution we must take care that we do not import into the discussion our own personal views of what would be wise, just, and fitting rules of government to be adopted by a free people, and confound them with constitutional limitations.' 211 U.S. at 106-107, 29 S.Ct. at 23.
 
 
 191
 In admonishing judges that they are not 'wholly at large' in applying the due process clause, Mr. Justice Frankfurter said in his separate opinion in Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945):
 
 
 192
 'The judicial judgment in applying the Due Process Clause must move within the limits of accepted notions of justice and is not to be based upon the idiosyncracies of a merely personal judgment.' 324 U.S. at 417, 65 S.Ct. at 789.
 
 
 193
 Courts indulging in judicial amendment of the Constitution and judicial legislation with respect to 1983 might well have kept in mind the biblical injunction:
 
 
 194
 'Render therefore unto Caesar the things which are Caesar's . . ..' Matthew, XXII, 21.
 
 
 195
 It merits notation that four Amendments extending civil rights have been added since adoption of the Fourteenth Amendment and that Congress, since enactment of the Civil Rights Act of April 20, 1871, has enacted a series of acts extending protection of civil rights.[19]
 
 
 196
 A proposed Twenty-seventh Amendment guaranteeing equal rights to women is now under submission to the legislatures of the several states.
 
 
 197
 The Constitution has been trivialized by interposition of 'judicial amendment,' and the fabric of 1983 has been stretched and attenuated by sequential 'judicial legislation.'
 
 
 198
 Federal courts have been swamped by a resulting mountainous flood of civil rights cases, as evidenced by the 1974 Annual Report of the Director of the Administrative Office of the United States Courts.
 
 
 199
 The Annual Report reveals that a staggering total of 8,443 civil rights cases were filed in the federal district courts in 1974-- an increase of approximately 2,750 percent over the 296 civil rights actions filed in 1961 when Monroe v. Pape, supra, was decided (February 20, 1961). (Table 16, at IX-21).
 
 
 200
 In startling contrast, the overall increase in all district court filings-- civil and criminal-- from 1961 to 1974 amounted to only 62.5 percent, viz., 86,753 in 1961 to 141,197 in 1974. (Table 14, at IX-18, and Table 44, at IX-61).
 
 
 201
 While the bulk of the civil rights filings are by prisoners alleging assaults by their custodians, they include in ever-increasing numbers these earthshaking categories: school regulations as to length of hair and mode of dress of pupils; city fire department regulations as to firemen's length of hair, beards and moustaches; denial of a 16-year old girl's right to membership on her high school's all-male swimming team; denial of a 13-year old girl's right to enter an all-male high school; alleged deprivation of a policewoman's right to achieve detective rank; and a prison guard's seizure of seven packs of cigarettes from a jail inmate.[20]
 
 
 202
 The flood-tide of custodial assault, hair and dress cases has been given impetus by judicial spawning of new and fresh concepts of due process in 1983 cases in disregard of the historic fact that 1983 and its Fourteenth Amendment centerpiece were designed primarily to cope with state racially-motivated deprivations of rights 'secured by the Constitution and laws,' and in further disregard of the fact that the Supreme Court has squarely held that application of 20, the criminal counterpart of 1983, is limited to deprivation of a right 'which has been made specific and definite' either by the express terms of the Constitution or laws of the United States or by decisions interpreting them.' Screws v. United States, supra, 325 U.S. at 104-105, 65 S.Ct. at 1037.
 
 
 203
 An inexplicable anomaly is presented when lower federal courts apply their own freshly fashioned concepts of due process in 1983 cases, in contrast to their application in 20 cases of due process concepts as previously defined by the Supreme Court, as required by Screws.[21]
 
 There remains this to be said:
 
 204
 I have accorded exhaustive discussion to the basic issues of constitutional and legislative construction presented in actions pursuant to the Civil Rights Act of 1871, and its derivatives, and to pertinent Supreme Court cases, in light of their transcending critical significance, particularly with respect to 1983 cases.
 
 
 205
 I am of the opinion that the summary judgments below in favor of the defendants must be affirmed for the reason that, viewed in the light most favorable to Polite, his complaints, deposition, Pre-Trial Narrative Statement and its annexed Medical Report, present a claim of custodial assault which, standing alone, did not violate Fourteenth Amendment guarantees so as to be within the reach of 1983. Simply stated, infliction of a black eye on one in custody by a policeman's fists, standing alone, is not a 'federal case.'
 
 
 206
 It is settled that while pleadings are to be liberally construed in favor of the party against whom the summary judgment motion is made, their conclusionary allegations, standing alone, do not create an issue of fact, and that courts in determining whether there is a bona fide dispute as to a material fact must consider, along with the complaints, depositions, affidavits, answers to interrogatories and requests for admissions, of record.[22]
 
 
 207
 Rule 56(c), Fed.R.Civ.P., provides in relevant part:
 
 
 208
 'The (summary) judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'
 
 
 209
 As the Advisory Committee on the 1963 Amendment to Rule 56(c), 28 U.S.C.A., stated in its Notes:
 
 
 210
 'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'
 
 
 211
 We cited and applied the foregoing epitomization of the 'mission' of the summary judgment rule in Robin Construction Company v. United States, 345 F.2d 610, 615 (3d Cir. 1965), where we held that summary judgment was appropriate when interrogatories, affidavits and accompanying documents of record did not raise any issue of genuine fact and presented only a question of law.
 
 
 212
 Depositions of plaintiffs were strongly relied on in granting summary judgment in favor of the defendants in Crest Auto Supplies, Inc. v. Ero Manufacturing Company, 360 F.2d 896, 900 (7th Cir. 1966).
 
 
 213
 There remains this to be said.
 
 
 214
 Standing alone, and independent of the foregoing considerations, the majority's short-shrift disposition of these appeals errs in the following respects:
 
 
 215
 First, the record below clearly establishes that the joining of Walter Lofstrom as a defendant in Polite's actions is utterly without legal basis. Polite's Complaints after alleging that Lofstrom 'was at all times relevant hereto the Chief of Police of the City of McKeesport Police Department,' further alleged that the defendant McKeesport policemen were 'at all times acting as the servants, employees, co-conspirators, and agents of the defendant, Walter Lofstrom.' Polite's Deposition is bare of any reference to Lofstrom's knowledge of, or participation in, the events which premise his actions. Polite's brief on this appeal clearly indicates that Lofstrom has been joined as a defendant under the doctrine of 'respondeat superior.' It is settled that conclusionary allegations in a complaint alleging Civil Rights Act violations will not survive a motion to dismiss.[23] It is further settled that an action is not maintainable against a police chief under the respondeat superior theory where he was not present, did not participate in, or have knowledge of, any civil rights violation. Jennings v. Davis, 476 F.2d 1271, 1274 (8th Cir. 1973).
 
 
 216
 Second, as to the reversal of the summary judgment in favor of Diehl at Appeal No. 72-1770:[24]
 
 
 217
 Polite in his Deposition completely absolved Diehl of any participation in the alleged assault incident. He testified therein that Diehl was 'standing by that rail'; that 'he didn't' hit him; 'he didn't' hold him during the alleged assault, and that 'he did not' spray any mace upon him.
 
 
 218
 Third, the majority's reversal of the summary judgments insofar as they concern the alleged 'unlawful seizure' of Polite's car, can only be categorized as a judicial 'sport.' Polite's Deposition shows that his automobile was badly damaged when it was ordered towed away by officer Diehl and that he had to pay a $500 repair bill for a 'new bumper, radiator and I think a fender.' All that needs to be said with respect to this aspect of the majority's disposition is that there is no 'wrongful deprivation of property . . . under color of state law' when a policeman orders an automobile with a smashed radiator towed away while he takes its operator and passengers to a hospital, and the car is returned to its owner the next morning.
 
 
 219
 Finally, assuming arguendo, that infliction of a 'black eye' on one in custody by a policeman's fists presents a 1983 case, Polite's Deposition only charged officer Rendulic with an assault. Failure of Polite in his Deposition to name any of the other policemen defendants as participating in the assault requires entry of summary judgment in their favor under our holding is Howell v. Cataldi, 464 F.2d 272 (1964), as spelled out at Note 23. It is to be further noted on this score that Polite's Complaints contained only general allegations that he was 'subjected to physical abuse by the defendants' without designating any of them by name. As stated in Note 23, we have time and again ruled that conclusory allegations of this nature require dismissal of a complaint.
 
 
 220
 As to the 'coerced guilty plea,' the deposition of Kenneth J. Carroll, custodian of records of the McKeesport Police Department, taken by Polite and filed of record, disclosed that Polite entered a 'Plea of N.G. (not guilty)' at the Sunday night hearing at which he was fined for disorderly conduct, resisting arrest, and failure to have a driver's license and ownership card as required by Pennsylvania law.
 
 
 
 [1]
 Polite was arrested on August 17, 1969. The first suit was filed on July 8, 1971; the second on August 11, 1971
 
 
 [2]
 Plaintiff's complaints, which are identical in this respect, invoke 42 U.S.C. 1983 (1974) in their jurisdictional statement only. Plaintiff's causes of action are then formulated under 42 U.S.C. 1981 (1974) and 42 U.S.C. 1985 (1974). The district court, apparently giving the complaints a broad reading, disposed of both of them under section 1983. Polite v. Diehl, Civ. Nos. 71-637; 71-760 (W.D. Pa., July 7, 1972)
 
 
 [3]
 Depositions had been taken of Diehl, Polite, the driver and passenger in the other car involved in the accident and the custodian of the records of the McKeesport Police Department. Polite had also filed an ophthalmologist's report. The defendants later filed a supplemental motion for summary judgment on the ground that the record contained no support for plaintiff's allegations 'exclusive of false imprisonment, false arrest and assault and battery.' (Appendix at 21a) The district court, in light of its disposition of the preceding motion for summary judgment, did not act on the supplemental motion for summary judgment
 
 
 [4]
 Pa.Stat.Ann. tit. 12, 51: 'Every suit to recover damages for malicious prosecution or false arrest . . . must be brought within one year from the date of the accruing of such right of action, and not thereafter: . . .'
 
 
 [5]
 Pa.Stat.Ann. tit. 12, 34:
 'Every suit hereafter brought to recover damages for injury wrongfully done to the person, in case where the injury does not result in death, must be brought within two years from the time when the injury was done and not afterwards; . . .'
 
 
 [6]
 446 Pa. 144, 285 A.2d 109 (1971)
 
 
 [7]
 Polite, supra, at 3
 
 
 [8]
 Polite, supra, at 3
 
 
 [9]
 See fn. 6
 
 
 [10]
 The Court of Appeals for the Ninth Circuit in Smith v. Cremins, 308 F.2d 187, 190 (9th Cir. 1962), adverted to the possible difficulties resulting from applying a separate statute of limitations to each constitutional violation alleged in a Section 1983 suit. There, however, the court was dealing with a single act by the defendant which violated several of plaintiff's constitutional rights. In the present case, however, the district court was dealing with separate acts where the alleged constitutional deprivations were not 'inextricably intertwined.' Moreover, the statutory framework in Smith was different from that here. The Smith court was faced with a choice between separate limitation statutes applicable to each analogous common law tort and a broad statute applicable to any 'liability created by statute.' The court decided that the broad statute was applicable. No such broad statute of limitations is available under Pennsylvania law
 
 
 [11]
 It has been asserted that the matter has been settled by this Court in Curtis v. Everette, 489 F.2d 516 (3d Cir. 1973) and Howell v. Cataldi, 464 F.2d 272 (3d Cir. 1972). See also Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973)
 
 
 [12]
 A complaint may not be dismissed for failure to state a claim 'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U.S. 41, him to relief.' Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), quoted with approval by the Supreme Court in Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)
 
 
 *
 'Black eye . . . a darkening of the skin about the eye resulting from a bruise.' Webster's Third New International Dictionary of the English Language Unabridged 226 (1971)
 
 
 [1]
 As earlier stated, the 'Medical Report' was attached to and made part of 'Plaintiff's Pre-Trial Narrative Statement,' which was filed of record on March 15, 1972
 
 
 [2]
 Edema is 'an abnormal accumulation of serious fluid in connective tissue causing puffy swelling.' Webster's Third New International Dictionary of the English Language Unabridged 722 (1971)
 
 
 [3]
 As earlier noted, Dr. Grana's 'Medical Report' states that Polite only told him that 'he was struck in (the) eye . . . by a policeman'; further, the Report is bare of evidence of injury to Polite's eyes by reason of application of mace
 
 
 [4]
 Black's Law Dictionary 193 (4th ed. rev. 1968)
 
 
 [5]
 Section 1 of the Fourteenth Amendment provides:
 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'
 
 
 [6]
 1983. Civil action for deprivation of rights
 'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'
 
 
 [7]
 '1343. Civil rights and elective franchise
 'The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 . . . .ict
 '(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; . . .'
 
 
 [8]
 Section 25 of the Judiciary Act of 1789, 1 Stat. 85, provided for Supreme Court review whenever a claim of federal right was denied by a state court
 
 
 [9]
 Zwickler v. Koota, 389 U.S. 241, 245, 88 S.Ct. 391, 394, 19 L.Ed.2d 444 (1967)
 
 
 [10]
 Fear v. Commonwealth of Pennsylvania, 413 F.2d 88, 89 (3d Cir.), cert. denied, 396 U.S. 935, 90 S.Ct. 278, 24 L.Ed.2d 234 (1969); Commonwealth of Pennsylvania ex rel. Gatewood v. Hendrick, 368 F.2d 179, 180 (3d Cir. 1966), cert. denied, 386 U.S. 925, 87 S.Ct. 899, 17 L.Ed.2d 797 (1967)
 
 
 [11]
 Kontos v. Prasse, 444 F.2d 166 (3d Cir. 1971); Gittlemacker v. Prasse, 428 F.2d 1, 5-6 (3d Cir. 1970)
 
 
 [12]
 Kent v. Prasse, 385 F.2d 406, 407 (3d Cir. 1967)
 
 
 [13]
 Section 20 of the Criminal Code (now 242, 18 U.S.C.A.) provided:
 'Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both.'
 
 
 [14]
 313 U.S. at 326, 61 S.Ct. at 1043
 
 
 [15]
 365 U.S. at 187, 81 S.Ct. at 484
 
 
 [16]
 Howell v. Cataldi, 464 F.2d 272, 278 (3d Cir. 1972)
 
 
 [17]
 In so doing the Court said:
 'The distinction between citizenship of the United States and citizenship of a State is clearly recognized and established. Not only may a man be a citizen of the United States without being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union.
 'It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual.
 . . . .te
 'The language is, 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.' It is a little remarkable, if this clause was intended as a protection to the citizen of a State against the legislative power of his own State, that the word citizen of the State should be left out when it is so carefully used, and used in contradistinction to citizens of the United States, in the very sentence which precedes it. It is too clear for argument that the change in phraseology was adopted understandingly and with a purpose.
 'Of the privileges and immunities of the citizens of the United States, and of the privileges and immunities of the citizens of the State, and what they respectively are, we will presently consider; but we wish to state here that it is only the former which are placed by this clause under the protection of the Federal Constitution, and that the latter, whatever they may be, are not intended to have any additional protection by this paragraph of the amendment.' 83 U.S. at 73-74.
 The Court gave these examples of rights of national citizenship:
 "To come to the seat of government to assert any claim he may have upon that government, . . . to seek its protection, to share its offices, to engage in administering its functions . . ..' 'To peaceably assemble and petition for redress of grievances, the privilege of the writ of habeas corpus . . .' 83 U.S. at 79.
 
 
 [18]
 Twining gave these examples of privileges and immunities of national citizenship, viz.:
 'The right to pass freely from state to state'; 'the right to petition Congress for a redress of grievances'; 'the right to vote for national officers'; 'the right to enter the public lands'; 'the right to be protected against violence while in the lawful custody of a United States marshal.' 211 U.S. at 97, 29 S.Ct. at 19.
 
 
 [19]
 The Fifteenth and Nineteenth Amendments, respectively, proscribe denial or abridgement of the right of citizens of the United States to vote 'on account of race, color, or previous condition of servitude,' or 'on account of sex'; the Twenty-fourth Amendment proscribes denial or abridgement of the right of citizens to vote in federal elections 'by reason of failure to pay any poll tax or other tax'; and the Twenty-sixth Amendment extends the right to vote to citizens 'who are eighteen years of age or older' in federal and state elections. Each of the foregoing Amendments provided that 'Congress shall have power to enforce this article by appropriate legislation.'
 Civil rights were extended by Congress in the Civil Rights Act of July 2, 1964, in the 'Public Accommodations Act' and the 'Equal Opportunities Employment Act,' 42 U.S.C.A. 2000a et seq. and 2000e et seq., respectively.
 The 'Public Accommodations Act' prohibits 'discrimination or segregation' in places of public accommodation, 'on the ground of race, color, (religion,) or national origin,' and provides federal remedies for enforcement; and the 'Equal Opportunities Employment Act' prohibits specified employment practices on account of 'race, color, religion, sex, or national origin.'
 The Civil Rights Act of 1964 also prohibits discrimination under federally assisted programs on the ground 'of race, color or national origin.' 42 U.S.C.A. 2000d et seq.
 
 
 [20]
 The piece de resistance of civil rights actions is United States ex rel. Mayo v. Satan and His Staff, 54 F.R.D. 282 (W.D.Pa.1971), where the plaintiff, alleging jurisdiction under 1983, prayed for leave to file a complaint in forma pauperis, for violation of his civil rights by 'Satan and His Staff' in causing plaintiff's downfall. The action was docketed albeit leave to proceed in forma pauperis was denied
 
 
 [21]
 Section 242, 18 U.S.C.A., successor to the criminal provision considered in Screws v. United States (Criminal Code 20, then 18 U.S.C.A. 52), differs only from 1983 in these relevant respects:
 Section 242 provides for imposition of a fine and/or imprisonment and it requires proof of an intent to 'willfully' deprive a person of a constitutional right while 1983 provides for 'redress,' viz., money damages and/or injunctive relief and requires no proof of intent to deprive a person of constitutional rights.
 
 
 [22]
 Jennings v. Davis, 476 F.2d 1271 (8th Cir. 1973) (a 1983 case); Machinery Center, Inc. v. Anchor National Life Insurance Company, 434 F.2d 1, 6 (10th Cir. 1970); H.B. Zachry Company v. O'Brien, 378 F.2d 423, 426 (10th Cir. 1967)
 
 
 [23]
 In Howell v. Cataldi, 464 F.2d 272, 282-284 (3d Cir. 1964), we affirmed a directed verdict in favor of the defendants where the plaintiff failed to adduce sufficient identification testimony linking the defendants to a 1983 violation
 In Negrich v. Hohn, 379 F.2d 213, 215 (3d Cir. 1967), we affirmed the dismissal of a 1983 complaint as insufficient because of 'its failure to state facts in support of its conclusions.'
 See too, Esser v. Weller, 467 F.2d 949, 950 (3d Cir. 1972); Marcedes v. Barrett, 453 F.2d 391, 392 (3d Cir. 1971); Fletcher v. Hook, 446 F.2d 14, 15-16 (3d Cir. 1971); Oliver v. Governor of the State of Pennsylvania, 442 F.2d 1347, 1348 (3d Cir.), cert. denied, 404 U.S. 1002, 92 S.Ct. 570, 30 L.Ed.2d 555 (1971); Gaito v. Ellenbogen, 425 F.2d 845, 849 (3d Cir. 1970); Kauffman v. Moss, 420 F.2d 1270, 1275 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); United States ex rel. Hoge v. Bolsinger, 311 F.2d 215, 216 (3d Cir. 1962), cert. denied, 372 U.S. 931, 83 S.Ct. 878, 9 L.Ed.2d 735 (1963).
 
 
 [24]
 Diehl was only joined as a defendant in Polite's action at Appeal No. 72-1770