Robert **WILKINSON** et al.

v.

John **ELLIS** et al.

**Civ. A. No. 77–869.**

United States District Court,
E. D. Pennsylvania.

Jan. 21, 1980.

Jack Levine, Robert J. Matthews, David Kairys, Philadelphia, Pa., for plaintiffs.

Stephen T. Saltz, Asst. City Sol., Philadelphia, Pa., for the police and city defendants.

Michael F. Henry, Asst. Dist. Atty., Philadelphia, Pa., for defendant Fitzpatrick.

Donald E. Matusow, Philadelphia, Pa., for defendant Haines.

John Rogers Carroll, Philadelphia, Pa., for defendant Berman.

Dennis J. Cogan, Philadelphia, Pa., for defendant Harris.

## MEMORANDUM OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This civil rights action arises out of the state investigation and prosecution that fol-

lowed the October 5, 1975 firebombing of the home of Radames Santiago in the Feltonville section of Philadelphia which killed five persons. The lead plaintiff is Robert Wilkinson ("Wilkinson"), who was convicted in the Philadelphia Court of Common Pleas of five counts of murder in connection with the firebombing, but who was subsequently, after serving 439 days in prison, cleared of any involvement in the crime.[1] The other plaintiffs are Wilkinson's wife, Christine Wilkinson, and his son, Robert Wilkinson, Jr. Defendants, all of whom are alleged to have been involved in some phase of the investigation or prosecution, include a number of Philadelphia police officers,[2] supervisory personnel of the police department and the District Attorney's office,[3] and the City of Philadelphia itself.[4] Advancing federal and pendent state law claims, plaintiffs seek both compensatory and punitive damages.[5] Before us are several motions to dismiss plaintiffs' claims, raising a variety of legal issues. We herein address and dispose of all but one of the issues raised by these motions,[6] while reserving decision on the final point until a later time.[7] Before our legal discussion, it will be useful to outline briefly plaintiffs' allegations. The complaint, which chronicles the factual basis for the plaintiffs' claims in enormous detail, alleges the following facts.

On October 5, 1975, plaintiff Robert Wilkinson was taken into custody for questioning concerning the firebombing of the San-

1. There was also a federal investigation and prosecution which resulted in the exoneration of Wilkinson and the convictions of David McGinnis and Ronald Hanley. The federal proceedings are not at issue here.

2. The police officer defendants include John Ellis, William Jones, James Crown, George Kuhar, James Carty, James Curley, Leonard Mitchell, and Roseborough McMillan. Ellis, Carty, Curley, Jones, Crown, and McMillan were convicted in federal court of conspiring to deprive Philadelphia citizens of federal civil rights in connection with their investigation of the firebombing; their convictions were upheld on appeal. *United States v. Ellis*, 595 F.2d 154 (3d Cir. 1979). They are currently serving 15 month sentences at a Florida federal prison camp.

3. Supervisory police defendants include Joseph O'Neill, Police Commissioner; Joseph Golden, inspector in charge of detective operations; Donald Patterson, captain in charge of the homicide division; James Murray, lieutenant and supervisor in the homicide division; and William Harris and John Brennan, both assigned to the District Attorney's office. District Attorney defendants include F. Emmett Fitzpatrick, the former District Attorney; Clifford Haines, Assistant District Attorney in charge of homicide; and David Berman, Assistant District Attorney assigned to the firebombing prosecution.

4. Also named as defendants are John Doe and Richard Roe, unknown police officers and prosecutorial officials who allegedly participated in the events described in the complaint.

5. Wilkinson alleges federal causes of action under the Civil Rights Acts, 42 U.S.C. §§ 1983, 1985, & 1988, and under 28 U.S.C. §§ 2201 & 2202. He originally applied for injunctive relief as well, seeking to prohibit the Commonwealth from retrying him after he won a new trial when the only eyewitness against him recanted his testimony. A motion for a temporary restraining order was denied and the entire retrial issue was mooted by a June 2, 1977 order, entered by Judge Merna Marshall of the Philadelphia Court of Common Pleas, terminating with prejudice all criminal proceedings against Wilkinson and dismissing the indictments. *Commonwealth v. Wilkinson*, November Term, 1975, Nos. 788-801 (C.P. Phila. June 2, 1977).

6. *See* Part III.D., *infra*, for a discussion of the outstanding issue. Three motions will be disposed of in the accompanying order with only the following discussion. The motion by defendant Harris for a more definite statement will be dismissed as moot, following the filing of an amended complaint designed to clarify the allegations with regard to his actions. The motion by defendant Berman for a more definite statement will be denied, for the complaint is more than adequately specific to allow defendant Berman to frame a responsive pleading. The motions by certain defendants to dismiss for lack of subject matter jurisdiction as to claims against them in their individual capacities is dismissed. That motion is based on a plainly incorrect theory, *see, e. g., Norton v. McKeon*, 444 F.Supp. 384, 386 (E.D.Pa.1977), *aff'd*, 601 F.2d 575 (3d Cir. 1979).

7. Because of the plethora of issues, parties, and motions, we have attempted to simplify our discussion by occasionally ascribing to the defendants generally a motion or argument which all defendants do not in fact join. We do this only where the identity or status of the moving defendant(s) is not important for purposes of resolving the issue(s) raised.

tiago residence. He was subsequently charged with the crime on the basis of an eyewitness account by sixteen-year-old Nelson Garcia, who stated that he had seen Wilkinson throw the firebomb. During interrogation, Wilkinson was beaten, threatened, and coerced by police defendants, and an involuntary statement, later suppressed on the ground that plaintiff did not understand the *Miranda* warnings he was given, was forcibly extracted from him. In addition to assaulting Wilkinson, the police defendants are alleged to have threatened and physically coerced suspects and witnesses, including plaintiff Christine Wilkinson, into making false statements consistent with Garcia's version of the incident.

On October 5 and 6 and November 3, 1975, the defendant detectives received written statements to the effect that plaintiff Robert Wilkinson was not involved in the crime, but that one David McGinnis, in the presence of others, had thrown the bomb. This information was, however, never investigated and, although defendants Berman, Haines, and Ellis knew of the statements prior to trial, defense counsel was never informed of them. Nor was counsel informed that, on November 14, 1975, Nelson Garcia gave a statement to police which differed materially from his previous statements.

On the eve of plaintiff's trial, March 26, 1976, David McGinnis came forward to explain to defendants Berman, Ellis, Brennan, and Harris his involvement in the firebombing, exonerating Wilkinson. McGinnis' written statement, the complaint alleges, was not revealed to defense counsel until midway into the trial; not until even later was it disclosed that a tape-recording had existed of a portion of the interview with McGinnis, but that the tape had been destroyed by defendant Berman. During the trial, defendants Ellis, Haines, and Berman made false statements to the court concerning disclosure of exculpatory material to defense counsel.

On October 4, 1976, after their own investigation of the firebombing incident, federal authorities furnished defendants Haines and Ellis with the entire federal investigative file. Although this investigation exculpated Wilkinson, defendant Haines refused to comply with the federal request to seek plaintiff's release. Because of this inaction, federal indictments against McGinnis and another were pursued, resulting in convictions.[8] The testimony at the federal trial again exonerated Wilkinson.

Furthermore, in November, 1976, Nelson Garcia stated in a sworn deposition that he had not seen Wilkinson throw the firebomb and, on December 20, 1976, he formally recanted his state trial testimony before a state judge. At the conclusion of the hearing, Wilkinson was finally released from prison. Nonetheless, on March 3, 1977, defendants Haines and Fitzpatrick, again without disclosing to defense counsel exculpatory evidence in their possession, approved and announced a decision to retry Wilkinson, who immediately moved to dismiss the indictment. During the hearing on this motion, the complaint further alleges, defendants Ellis and Berman again perjured themselves concerning their conduct in the firebombing investigation. On March 10, 1977, the complaint in this action was filed. On June 2, 1977, the state court granted Wilkinson's motion to dismiss, holding that the prosecution was being maintained in bad faith without reasonable expectation of obtaining a supportable verdict.[9]

Thus, in summary, plaintiffs have alleged:

Starting in October, 1975, Defendants intentionally and maliciously engaged in a pattern and course of conduct that included their ignoring, secreting, and destroying evidence that Wilkinson had neither thrown the bomb nor been in-

---

8. *United States v. Hanley et al.*, Crim. No. 76–513. McGinnis pled guilty on December 15, 1976; his co-defendant, Ronald Hanley, was subsequently tried and convicted on January 7, 1978.

9. *Commonwealth v. Wilkinson, supra* note 5.

volved—evidence that, viewed fairly, amounted to conclusive proof of Wilkinson's innocence. This pattern and course of conduct was intended by the defendants to justify their continued prosecution of Plaintiff Wilkinson and thereby avoid or soften exposure of the irresponsible and unlawful course of the investigation.

Starting in early October, 1975, the defendants, under color of the laws and authority of the Commonwealth of Pennsylvania, having first pursued an erroneous course in their investigation and utilized unlawful and brutal methods, proceeded to knowingly, intentionally, and maliciously deprive Plaintiff Robert Wilkinson of his liberty and other rights secured by the Constitution of the United States after there was no sufficient or believable cause that he was guilty in an apparent attempt to foreclose or minimize the repercussions of their irresponsible, illegal, and unjustifiable acts.

Complaint, ¶¶ 51 & 54.[10] We turn now to the issues raised by defendants' motions.

## II. The Statute of Limitations Issues

Defendants contend that some or all of Wilkinson's federal and state law claims were time-barred when he filed his complaint on March 10, 1977.[11] We assess these contentions by first setting forth the general principles governing limitations in civil rights cases, and then by applying these principles to each of Wilkinson's claims.

There being no limitations period written into the Civil Rights Act, as a federal court sitting in Pennsylvania we must apply the Pennsylvania limitations period(s) for the tort or torts most analogous to the conduct alleged in the complaint. See Polite v. Diehl, 507 F.2d 119, 122 (3d Cir. 1974); Ammlung v. City of Chester, 494 F.2d 811 (3d Cir. 1974). Where the analogous state causes of action are "inextricably intertwined," all of the defendant's alleged conduct may be subsumed under one limitations period, see, e. g., Gagliardi v. Lynn, 446 Pa. 144, 285 A.2d 109 (1971), but where the analogous causes of action are "separable," different statutes of limitations may be applied. See, e. g., Polite v. Diehl, supra.

Wilkinson contends that the assault and battery, malicious prosecution, abuse of process, and intentional infliction of emotional distress causes of action alleged in his complaint are separable and thus governed by different statutes of limitations. He submits that the assault and battery and intentional infliction claims are governed by 12 P.S. § 34, which allows two years to bring personal injury actions; that the abuse of process claim is governed by 12 P.S. § 31, a two-year statute for other kinds of personal actions; and that the malicious prosecution claim is governed by the one-year period of 12 P.S. § 51. We agree with Wilkinson's analysis of these causes of action and the applicable limitations period for each,[12] and conclude that they are separable and not time-barred.[13]

10. While the above recitals have been framed in terms of the allegations of the complaint and our decision rests on the legal sufficiency of the pleadings alone, it is a matter of widespread public knowledge that a number of these allegations have actually been admitted or established in other court proceedings. For example, defendant Berman has admitted to having thrown out the tape recording of the interview with David McGinnis. It has also been established that the Commonwealth's files contained statements by several persons interviewed by the police within one month after the firebombing, implicating McGinnis and another while tending to exculpate Wilkinson, but that none of these statements were turned over to the defense. Finally, when Judge Marshall dismissed the indictments against Wilkinson, she did so on grounds, inter alia, of prosecutorial misconduct.

11. Because no defendant contends that Christine's or Robert, Jr.'s claims are time-barred, we address only Wilkinson's claims in our limitations discussion. We note that our analysis is the same respecting both the federal and state law claims.

12. We note that Pennsylvania has recently amended some of its limitations statutes, see 42 Pa.C.S. § 5501 et seq., but we do not consider the applicability of the amendments because they expressly provide that they cannot revive a time-barred claim.

13. The complaint also alleges false arrest and false imprisonment claims, but Wilkinson ap-

■ Wilkinson's assault and battery claim accrued on October 5, 1975, when he was allegedly beaten by the police defendants sometime after his arrest. *See* complaint ¶ 23. Some of the defendants contend that Wilkinson's assault and battery claim is "inextricably intertwined" with his false arrest claim, and thus is subsumed under the one-year false arrest statutory period. However, this identical argument was rejected by the Third Circuit Court of Appeals in *Polite v. Diehl, supra.* The *Polite* Court, explaining *Gagliardi v. Lynn, supra,* the leading case on the scope of Pennsylvania's statute of limitations for false arrest actions, said that a "touching" committed in accomplishing a false arrest would be subsumed under the one-year provision but that any "touching" not so "inextricably intertwined" as, for example, an assault while the arrestee is being held at the police station, would be governed instead by the two-year personal injury limitations statute. *Polite v. Diehl, supra,* at 122–23. Here Wilkinson has alleged not a "touching" in the course of effecting an arrest, but a beating inflicted later during interrogation at the police station. Thus the two-year period of 12 P.S. § 34 applies, and Wilkinson's assault and battery claims were timely filed on March 10, 1977, less than two years after they accrued.

■ Wilkinson's cause of action for intentional infliction of emotional harm, a tort now clearly accepted under Pennsylvania law, *see Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979) (en banc), accrued on October 5, 1975, when, according to the allegations of the complaint, some of the police defendants beat and threatened him, told him, *inter alia,*

that he would lose custody of Robert, Jr. unless he signed a statement implicating himself in the firebombing, and ultimately coerced an involuntary and untruthful confession from him. *See* complaint ¶¶ 23, 27, and 28. Defendants do not, and could not, seriously argue that these alleged activities are "inextricably intertwined" with the initial arrest. Because these allegations state a separable cause of action for injury to the person, they are governed by the two-year period of 12 P.S. § 34, and the claim was timely filed.

■ Wilkinson's complaint in effect states two separate claims for malicious prosecution, or prosecution without probable cause: one relating to the initial prosecution, and a second relating to the decision to reprosecute. The limitations period applicable to an action for malicious prosecution is 12 P.S. § 51, a one-year statute, but the cause of action does not accrue until there has been a disposition terminating the underlying criminal proceeding in such a manner that it cannot be revived. *See Sicola v. First National Bank,* 404 Pa. 18, 170 A.2d 584 (1961). The criminal proceedings against Wilkinson were not terminated until June 2, 1977, when Judge Marshall dismissed the indictments with prejudice; hence his malicious prosecution claims were timely filed.

■ Wilkinson's final state law claim is for abuse of process, which is the use of legal process against another primarily to accomplish a purpose for which it is not designed. *See, e. g., Jennings v. Shuman,* 567 F.2d 1213 (3d Cir. 1977). Wilkinson alleges that legal process was used against him, not for the permissible purposes of bringing a guilty person to justice or en-

---

pears to concede, by failing to list these in his Memorandum in Response to Defendants' Motions to Dismiss, that they are time-barred. Under Pennsylvania law an action for false arrest must be brought within one year from the time the cause of action accrues, 12 P.S. § 51, as must an action for false imprisonment based on incarceration arising out of an allegedly unlawful arrest. *See Kedra v. City of Philadelphia,* 454 F.Supp. 652, 670–71 (E.D.Pa. 1978); *Gagliardi v. Lynn,* 446 Pa. 144, 285 A.2d 109 (1971). Wilkinson's Complaint arguably

concedes probable cause at the time of the arrest, but goes on to allege the dissipation of this probable cause so as to render illegal his continued incarceration. However, he does not press this contention. There is no serious question that there was probable cause at the time of arrest. Accordingly, Wilkinson's causes of action for false arrest and for false imprisonment growing out of the false arrest, which accrued on October 5, 1975, were time-barred when he filed his complaint on March 10, 1977.

forcing the law, but for the impermissible purposes of covering up or minimizing the repercussions of defendants' illegal conduct. The statute of limitations for abuse of process is the general trespass two-year statute of 12 P.S. § 31. *See, e. g., Jennings v. Shuman, supra.* The abuse of process action did not accrue until the relevant defendants became aware of events, including McGinnis' confession, which suggested Wilkinson's innocence. These events were all well within the two-year period.

Concluding as we do that Wilkinson's claims are separable and that none with the exception of his false arrest and false imprisonment claims is time-barred, *see* n. 13 *supra,* we reject defendants' statute of limitations contentions and decline to dismiss on those grounds.

## III. *Prosecutorial Immunity*

### A. *General Principles*

The motions to dismiss by assistant district attorney defendants Haines and Berman raise several difficult issues of the extent to which prosecutorial personnel are immune from civil suits for damages under § 1983.[14] The preeminent case on prosecutorial immunity is *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Accordingly, we look to *Imbler* and to the Third Circuit's most recent exposition of *Imbler, Forsyth v. Kleindienst,* 599 F.2d 1203 (3d Cir. 1979), for guidance in resolving these issues.[15]

In *Imbler* the Supreme Court granted to a state prosecutor absolute immunity from a § 1983 suit which charged him with the knowing use of perjured testimony. The Third Circuit has characterized the *Imbler* holding as narrow, noting that the Court emphasized that the prosecutor's activities in *Imbler* "were intimately associated with the judicial phase of the criminal process," and therefore, were "functions to which the reasons for absolute immunity apply with full force." 424 U.S. at 430, 96 S.Ct. at 995. *See Forsyth, supra,* at 1213. *Imbler* left open the question whether a prosecutor should have absolute immunity for those aspects of his responsibility that cast him in the role of an administrator or investigative officer, rather than that of an advocate. In *Forsyth* the Third Circuit answered this question in the negative, holding that where the activities of a prosecutor depart from those which cast him in a quasi-judicial role, the protection of absolute immunity will not be available. 599 F.2d at 1214–15. For those non-advocatory functions, a prosecutor has qualified immunity only.[16]

 The test we derive from *Imbler* and *Forsyth* for determining the scope of immunity to be afforded for particular prosecutorial activities is a functional one: there is absolute immunity for quasi-judicial functions, but only qualified immunity for administrative or investigative functions.[17] Plaintiffs have suggested several

---

14. Defendant Fitzpatrick also moves to dismiss on the grounds of prosecutorial immunity, but the issues he raises are sufficiently different from the ones raised by Haines and Berman to warrant separate treatment. *See* Part IV., *infra.*

15. Although *Imbler* was a § 1983 action against a state prosecutor while *Forsyth* involved a *Bivens*-type action against federal officials, the Third Circuit has held that public policy mandates extension of a similar immunity to state and federal prosecutors. *See Brawer v. Horowitz,* 535 F.2d 830, 834 (3d Cir. 1976).

16. The *Forsyth* court did, however, carve out a narrow exception to the general rule that a prosecutor's investigative activity would receive only a qualified immunity, holding that to the extent that the securing of information is necessary to a prosecutor's decision to initiate

a criminal prosecution, it is encompassed within the absolute protection afforded the decision itself. 599 F.2d at 1215. We understand this exception to be an expression of the perception that some investigative activity is tied so closely to quasi-judicial activity that to deny absolute immunity for the former would dilute the immunity accorded the latter. As will appear *infra,* this investigative exception may be relevant to some of the prosecutorial activities alleged in the complaint.

17. *But see* note 16, *supra.* There may, of course, also be situations in which a prosecutor's conduct cannot be included within any of the three functional categories suggested in *Imbler* and *Forsyth,* but instead goes beyond the

factors to consider in undertaking a functional analysis of particular prosecutorial activity: the physical and temporal relationship of the activity in question to the judicial process,[18] the degree to which the acts depend upon legal opinions and/or discretionary judgments,[19] and the extent to which the acts at issue are primarily concerned with the prosecutor's role as an advocate.[20] We find these factors to be useful and will apply them to the allegations of the complaint as an aid in determining the scope of the immunity appropriate to this case.

The two assistant district attorneys whose motions we now consider are Haines, the chief of homicide, and Berman, the prosecutor assigned to the Santiago firebombing case. Plaintiffs' allegations with respect to them may be summarized as follows: 1) Both Berman and Haines knew of and failed to prevent an ongoing pattern of police use of illegal investigative methods, and were present during or participated in some or all of the unlawful interrogations concerning the Santiago firebombing, ¶¶ 16 and 22; 2) Both Berman and Haines knowingly withheld exculpatory evidence from Wilkinson's lawyer, ¶¶ 35, 38, 40, 41, and 43; 3) Berman threw away a tape-recorded statement by David McGinnis (who was subsequently convicted of the firebombing, ¶ 48) that Wilkinson was not involved in the firebombing, ¶ 38; 4) Both Berman and Haines made false declarations in various court hearings regarding the existence of exculpatory evidence, ¶ 42; and 5) Both Berman and Haines acted in bad faith in continuing to prosecute Wilkinson without probable cause and in deciding to re-

prosecute him when he won a new trial, ¶¶ 49, 51, and 54.

Plaintiffs concede that their allegations concerning the withholding of exculpatory material, the decision to prosecute, and the decision to reprosecute Wilkinson come within the ambit of the absolute immunity delineated in *Imbler.* They contend, however, that there are three categories of prosecutorial activity alleged in the complaint that are nonadvocatory, and therefore protected only by qualified immunity: participation in and/or knowledge of illegal police activity; destruction of evidence; and giving false testimony concerning the existence of exculpatory evidence.[21] Employing the *Imbler/Forsyth* "functional approach," we turn now to a discussion of these three categories of alleged prosecutorial activity.

B. *False Testimony Concerning the Existence of Exculpatory Evidence*

■ Wilkinson attempts to distinguish between withholding exculpatory evidence from the defense on the one hand and falsely testifying in court proceedings as to the existence of such evidence on the other; he concedes absolute immunity for the former, but asks us to hold that the latter is subject only to qualified immunity. We believe this distinction to be untenable, and we decline to so hold.

Wilkinson relies heavily on *Briggs v. Goodwin,* 186 U.S.App.D.C. 179, 569 F.2d 10 (D.C.Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978), in which the court characterized as "investigative" the role of a Justice Department attorney who allegedly stated falsely, under oath,

---

proper performance of any aspect of a prosecutor's job. *See Helstoski v. Goldstein,* 552 F.2d 564, 566 (3d Cir. 1977). Such conduct would be subject to qualified immunity at most.

**18.** *See Briggs v. Goodwin,* 186 U.S.App.D.C. 179, 193, 569 F.2d 10, 24 (D.C.Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

**19.** *See Imbler v. Pachtman,* 424 U.S. at 423 n.20 and 424–26, 96 S.Ct. at 991 n. 20.

**20.** *See Briggs v. Goodwin, supra,* note 18, 186 U.S.App.D.C. at 190–191, 569 F.2d at 21–22,

rejecting appellant's absolute immunity claim because his alleged activity was not "advocatory" as contemplated by *Imbler.*

**21.** Plaintiffs have alleged both false sworn testimony at certain hearings and knowingly false statements to the court as members of the bar and officers of the court. While recognizing the difference between the two types of statements, we will refer to them collectively as "false testimony," for the distinction has no bearing on our analysis.

that none of a group of witnesses subpoenaed to appear before a grand jury, all ostensibly members of an antiwar group, were in reality government informants.[22] Having characterized the conduct at issue as "investigative," the *Briggs* majority affirmed the district court's order denying the prosecutor's motion to dismiss, holding that investigative activity, unlike quasi-judicial activity, is entitled to only qualified immunity.[23]

Emphasizing the *Briggs* court's statement that the prosecutor's alleged perjury "[bore] no relation whatever to the advocate's role as conceived by the Supreme Court in *Imbler*," 186 U.S.App.D.C. at 190, 569 F.2d at 21, Wilkinson reasons that the alleged perjury in the instant case is non-advocatory as well. The flaw in Wilkinson's reasoning is that *Briggs* did not hold that perjury *qua* perjury was non-advocatory.[24] Instead, it found that the prosecutor's allegedly false statement was made in an investigative capacity after focusing on considerations similar to those we adopted, at plaintiffs' suggestion, to aid our analysis of this issue. *See* notes 18–20 and accompanying text, *supra.*

Examining the false testimony alleged in this suit in light of those considerations, we are constrained to characterize it as quasi-judicial activity, and thus to hold that it is protected by absolute immunity. First, the statements to the court were closely related, both physically and temporally, to an ongoing criminal prosecution. Second, the determination whether or not evidence is "exculpatory" is a uniquely legal judgment. Finally, the conduct alleged is so closely connected with the whole range of evidentiary judgments made by a prosecutor in an advocatory role that it cannot be separately considered. In fact, to permit this suit would, as a practical matter, negate an immunity which plaintiffs concede, *i. e.,* immunity for failing to turn over exculpatory evidence.

We would reject, as did the *Briggs* court, any claim that conduct was per se "intimately associated with the judicial process," *see Imbler, supra,* 424 U.S. at 430, 96 S.Ct. at 995, solely because it occurred in a courtroom exchange. 186 U.S.App.D.C. at 192, 569 F.2d at 23. However, our decision that the alleged perjury in this suit was committed in the performance of the prosecutor's quasi-judicial function is not based on these grounds; rather, it is based on the kind of functional analysis we read *Imbler* and *Forsyth* to require.

## C. *Destruction of Evidence*

■■■ Wilkinson urges that because the McGinnis tape was evidence gained by prosecutors in their investigative capacities, Berman's alleged destruction of the tape was an investigative act, protected by only qualified immunity. Berman, on the other

---

**22.** *Briggs* was a 2–1 decision, written by Judge McGowan for himself and Judge Robinson, with Judge Wilkey authoring a lengthy dissent.

**23.** The Third Circuit's views on the *Briggs* case are far from clear. In *Jennings v. Shuman,* 567 F.2d 1213, 1221 (3d Cir. 1977), the court cited *Briggs* as the only court of appeals decision to have considered the question, left open in *Imbler,* whether a prosecutor should have absolute immunity for non-advocatory activity. The *Jennings* court also noted that because it was not required to decide the open *Imbler* question, it would not comment on the correctness of *Briggs* except to note that there was a split of opinion in *Briggs* itself and among commentators generally. 567 F.2d at 1221 n.15. Then in *Forsyth* the Third Circuit did answer the open *Imbler* question, agreeing substantially with the *Briggs* court, but saying that in its *Jennings* opinion it had questioned the correctness of the scope of the immunity afforded in

*Briggs.* 599 F.2d at 1214. We believe, however, for reasons we discuss *infra,* that Wilkinson's reliance on *Briggs* is misplaced irrespective of the Third Circuit's views on the case.

**24.** The *Briggs* court rejected this somewhat simplistic approach in that although it affirmed the district court's order denying the prosecutor's motion to dismiss, it expressly disapproved the lower court's reasoning. The district court had reasoned that since a prosecutor was immune from suit only when acting within the scope of his authority, there could be no immunity for a prosecutor who allegedly perjures himself, because perjury is never within a prosecutor's authority. The court of appeals, in opting for a functional approach, said that the district court's approach would completely abrogate the immunity doctrine. 186 U.S.App. D.C. at 184, 569 F.2d at 15.

hand, contends that throwing evidence away is functionally indistinguishable from refusing to furnish it to the defense or lying to the court about whether or not it exists. It was, he claims, a *Brady* judgment [25] (that McGinnis was lying and therefore his statement did not exculpate Wilkinson) performed in his quasi-judicial role, for which he is absolutely immune.[26]

We must confess that we have some difficulty in functionally categorizing the prosecutorial act of discarding a tape-recorded confession to a crime by one person on the eve of another's trial for that same crime. Because it does not fit neatly into any of the three categories—quasi-judicial, investigative, or administrative—suggested by *Imbler* and *Forsyth*, we approach the problem by examining Berman's alleged conduct in light of those features, previously enumerated, which generally characterize quasi-judicial activity, the category for which absolute immunity is available. *See* notes 18–20, *supra*, and accompanying text.

First, although the evidence was thrown away on the eve of trial, that action was not closely related to the judicial process. Indeed, when evidence is disposed of, it is kept from judicial scrutiny altogether. In terms of the extent to which the decision to throw away evidence involves the exercise of discretion, we cannot accept Berman's characterization of his act as a *Brady* judgment.[27] Prosecutors make *Brady* judgments when they decide whether to turn evidence over to the defense or when they respond to a court's question as to whether there is "exculpatory" evidence in their files. *Imbler* absolutely protects these prosecutorial acts by shielding prosecutors from suits alleging that their judgments were wrong, or even that they were wrongly

motivated. But even if we were to accept Berman's representation that he made such a judgment with respect to the McGinnis tape, it would explain only why the tape was kept from the defense, not why it was destroyed. We view the distinction as critical and dispositive—in Wilkinson's favor.

It can of course be argued—and with considerable force—that there is no conceptual difference between withholding and destroying evidence, and that we are really looking at a continuum on which various results flow from the same decision. On the other hand it can be argued, and indeed we think with greater force, that once the decision is made not to furnish evidence to the defense, no additional protectible prosecutorial discretion is involved in deciding to dispose of it, and similarly that, while deciding not to furnish the prosecution's evidence to the defense may be an act of advocacy, throwing that evidence away is not such an act.

In such a situation, the decisional process becomes one of judicial line-drawing, a difficult process, but one which can be aided by an examination of the policies underlying the question at issue. In the context of prosecutorial immunity, the most important policy consideration articulated by the *Imbler* Court concerns the danger that the exercise of prosecutorial discretion might be unduly influenced if civil suits were permitted. Specifically, the Court noted that while an executive may face angry citizens on either side of a contemplated discretionary action, a prosecutor is likely to be sued only when he decides, rather than declines, to prosecute. If a prosecutor wished to avoid potential liability, and this desire led him to bring fewer prosecutions, his ability

---

**25.** *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**26.** We note that this would seem inconsistent with Berman's testimony at Wilkinson's *Brady* hearing before Judge Geisz of the Philadelphia Court of Common Pleas that he (Berman) was not familiar with the contents of the tape because he was not present when McGinnis's statement was made. Because this is a motion to dismiss rather than a motion for summary judgment, however, we advert to this testimo-

ny only in passing, and do not rely on it in disposing of the motion.

**27.** It is, of course, true that all office "housecleaning" or file straightening requires the exercise of some judgment. There is no suggestion, however, that the McGinnis statement was discarded as part of such routine upkeep. To the contrary, Berman's action took place in the context of a particular prosecution.

to perform his public duty would be diminished. In addition, the Court pointed out that the sheer volume of potential lawsuits poses a grave threat to both prosecutorial decisionmaking and the public interest: because there is an identifiable potential plaintiff each time a prosecution is initiated, in an already overloaded criminal justice system defense of such actions could drain a disproportionately large amount of prosecutorial time.

The *Imbler* Court also mentioned certain unique considerations which support granting absolute immunity to prosecutors. First, if prosecutors face the possibility of damage suits for the denial of due process, they may be dissuaded from admitting weaknesses in their cases or producing later-discovered exculpatory evidence. Furthermore, judges may be less prone to reverse convictions on appeal if their findings could trigger damage suits. Additionally, the Court noted that due to "serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation," 424 U.S. at 425, 96 S.Ct. at 992–993, but that reexamination of prosecutorial decisionmaking in a civil proceeding, after it has been judicially scrutinized via appellate review, would amount to a retrial of the criminal charges in a new forum, and for that reason should be avoided.

In our view, none of these policy considerations would be undermined by denying absolute immunity to a prosecutor who is charged in a civil suit with having destroyed evidence in a pending criminal prosecution. There would be no chilling effect on the exercise of legitimate prosecutorial discretion, for evidence could merely be re-

tained for a reasonable period. Moreover, because civil rights plaintiffs must plead facts with specificity, *see e. g., Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922 (3d Cir. 1976); *Kauffman v. Moss*, 420 F.2d 1270, 1275–76 (3d Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970), there would be little chance of a proliferation of frivolous civil suits on these grounds. Although the policies undergirding *Imbler* could be further served by extending prosecutorial immunity to destruction of evidence, we believe it improvident to extend the immunity beyond the boundaries necessary to ensure that the underlying policies are fulfilled. Furthermore, we believe there to be countervailing policies in this situation which reinforce our view that the prosecutorial acts here alleged are entitled to only qualified immunity. The destruction of evidence has a uniquely damaging effect on the administration of justice, for once evidence has been destroyed it cannot be retrieved for judicial review. And the destruction is irrevocable, with a concomitant impossibility of vindication by a wronged defendant and an accompanying subversion of the public interest in correct, not merely swift, justice.[28]

Accordingly, while it is problematical whether the activity at issue can be characterized as "investigative"[29] or "administrative,"[30] and while the decision is a close one, we are convinced that the rationale underlying the absolute immunity doctrine of *Imbler* and *Forsyth* fails to support such immunity for the activity alleged here, particularly in light of the countervailing policies enunciated above. Therefore, we hold that defendant Berman is entitled only to qualified immunity for his alleged destruc-

---

**28.** We recognize, of course, that the sterilization involved in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) was equally irrevocable. Judicial immunity, however, is wider than is prosecutorial immunity: a Judge is absolutely immune from civil suit so long as he has jurisdiction over the subject matter before him. That jurisdiction was found in *Stump.*

**29.** Wilkinson argues that the gathering of evidence is an investigative act, citing *J.D. Pflaumer, Inc. v. United States Dept. of Justice*, 450 F.Supp. 1125 (E.D.Pa.1978). However, his allegations go not to the initial gathering of evidence, but to the subsequent destruction of that evidence in connection with a pending judicial proceeding.

**30.** *See* note 27, *supra.*

tion of the McGinnis tape, and his motion to dismiss will be denied.[31]

D. *Participation in Illegal Police Activity*

Plaintiffs allege that Haines and Berman were present during, and participated in to some extent, the illegal police interrogations. They also allege that with knowledge of the specific illegalities pleaded in the complaint and of an ongoing pattern of such police behavior generally, Haines and Berman wrongfully failed to prevent or remedy the illegal conduct. Defendants make two contentions with respect to these allegations: first, they say no claim is stated against them by these allegations; and second, they say that if a claim is stated, they have absolute immunity under *Imbler.* We reject defendants' first contention, and reserve decision on the second.

In our view, immunity considerations aside, plaintiffs' allegations that the assistant district attorneys participated in the illegal police conduct are enough, standing alone, to withstand this motion to dismiss. Moreover, we believe that allegations that the defendants were present during police beatings or coercion, even without any allegations of direct participation, would state a claim against them. It is a long-established principle that § 1983 should be read against a tort background, *see Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds in Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), so that liability under § 1983 may clearly be based on acts of omission, at least insofar as a duty to act exists.

This was precisely the theory of liability in *Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972), in which the court held that the failure of a non-supervisory police officer to stop other officers from summarily punishing a third person in his presence is actionable under § 1983 because it constitutes neglect of his duty to enforce the law. We believe that the prosecutors in this case, like the police in *Byrd,* had a duty to intervene if, as plaintiffs allege, summary punishment was being inflicted by police officers in their presence. While the prosecutor's function is clearly different from that of a police officer, he is nonetheless a quasi-judicial officer, *see, e. g., Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 232 A.2d 729 (1967), with a duty to seek impartial justice, to see that no innocent man suffers and no guilty man escapes. *Commonwealth v. Nicely,* 130 Pa. 261, 270, 18 A. 737 (1889). It is the alleged failure to perform this duty, rather than any failure to supervise the police, that forms the basis for the cause of action.

As for the absolute immunity issue, we believe the plaintiff's allegations of prosecutorial involvement in illegal police activity bring the conduct squarely within *Forsyth.* If Berman and Haines were involved in the police activity at the Police Administration Building on the night of the firebombing, quite clearly they were acting in an investigative capacity. To the extent that their investigative activities consisted of gathering information necessary to decide whether to initiate a criminal prosecution, they are absolutely immune under *Forsyth.* For any investigative activity beyond this necessary information-gathering, *Forsyth* accords them only qualified immunity. *Forsyth* teaches that to place investigative activity into one or the other of these two categories may require some lim-

---

**31.** We note that the Seventh Circuit reached a contrary result in *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979) and *Heidelberg v. Hammer,* 577 F.2d 429 (7th Cir. 1978). Those cases do not analyze the issue, however, merely stating the conclusion and citing *Imbler.* We respectfully disagree that *Imbler* leads inexorably to the Seventh Circuit's result. We are more inclined to agree with *Cunningham v. Tonetti,* 78 Civ. 993 (WWC) (S.D.N.Y. July 13, 1978), in which a judge was alleged to have participated in a conspiracy to destroy evidence. Judge Conner, in an unpublished opinion, wrote that "[a]n agreement to conceal, destroy or manufacture evidence is plainly not [a judicial] act." Slip op. at 3. We would not, however, be inclined to extend our rationale quite so far, and hold only that a prosecutor is not absolutely immune for the destruction of evidence.

ited exploration of the factual setting in which the activity took place, 599 F.2d at 1215–16. Accordingly, we authorize, in the accompanying order, the taking of discovery on this point, and we reserve decision on the motions to dismiss this claim.

### IV. *Liability of the Police Commissioner and the District Attorney*

Defendants O'Neill and Fitzpatrick, the Police Commissioner and former District Attorney respectively, contend that plaintiffs' factual allegations are insufficient to support any theory of liability against them, and move to dismiss on those grounds. For reasons explained *infra*, we grant Fitzpatrick's motion to dismiss but deny O'Neill's.

The claims against Fitzpatrick and O'Neill are essentially the same. The complaint alleges that beginning on October 5, 1975 and continuing thereafter, certain defendants other than O'Neill and Fitzpatrick threatened and coerced witnesses into making false statements incriminating Wilkinson, and that O'Neill and Fitzpatrick were aware of an ongoing pattern of the use of such methods by the police both generally and in this case, yet failed to remedy or prevent the unlawful consequences. Complaint ¶ 22. Paragraphs 22 through 26 of the complaint outline specific facts of which O'Neill and Fitzpatrick allegedly had gained subsequent knowledge but had failed to act upon, including, *inter alia*, that various statements implicating Wilkinson had been coerced and were false, and that the witnesses who made these statements had been beaten and threatened by Philadelphia police.

The basis for plaintiffs' claims against O'Neill and Fitzpatrick is that of supervisory inaction. After the Supreme Court's decision in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), there was some question whether official inaction could ever be a basis for § 1983 liability.

*Rizzo* held that the causal link between official inaction and a constitutional violation is insufficient if all that is found is a supervisor's failure to act in the face of unconstitutional actions by subordinates, but that the requisite causal connection can be established from the fact that the subordinates' actions are an implementation of policies or practices endorsed by the supervisor. *See Santiago v. City of Philadelphia*, 435 F.Supp. 136, 152 (E.D.Pa.1977). The existence of general policies and practices within an organization can create constructive knowledge on the part of the supervisor of alleged constitutional deprivations, and the greater the duty a supervisor has to control those employees who actually committed the violation(s), the less specific knowledge of the offending conduct the supervisor will be required to have. *Id.*

In *Rizzo* the plaintiffs were given the opportunity to prove the existence of the requisite causal connection, but the Supreme Court held that their trial proof was insufficient for purposes of establishing supervisory liability. Plaintiffs in this case have not yet had an opportunity to prove, or even to take discovery on, their claims. We read the complaint to allege specific knowledge on O'Neill's part of a pervasive pattern of illegal police behavior generally and in this case, and to allege that O'Neill had ultimate supervisory responsibility for the police who actually committed the alleged beatings, threats, and other coercive acts. If in fact O'Neill actually knew of the pervasive pattern of abuse alleged to have resulted in plaintiff's injuries yet failed to take any steps to remedy or prevent this situation, his endorsement of these practices could be inferred under the principles set forth in *Rizzo*. Whether or not plaintiffs can actually produce evidence of such a pattern and of O'Neill's knowledge of it is an issue which can properly be tested on a motion for summary judgment.[32] Under Federal Rule of Civil Procedure 12(b)(6), all well-pleaded allegations must be taken as

---

**32.** We note that the Tenth Circuit recently reversed a summary judgment for police supervisory personnel, holding in *McCelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979), that there was a factual issue for jury consideration as to whether the police chief had adequate notice of police misconduct in order to find that he had breached his duty to supervise.

true for purposes of a motion to dismiss, and the allegations of the complaint against O'Neill are sufficient to withstand his motion.

■ Although plaintiffs' claims against Fitzpatrick are nearly identical to those against O'Neill, we reach the opposite result on his motion. Assuming, as we must at this juncture, that Fitzpatrick knew all he is alleged to have known with respect to patterns of police abuse he nevertheless had no direct supervisory authority over the police. Because he had no such authority, a § 1983 suit based only on his alleged failure to supervise is untenable. The complaint also charges Fitzpatrick with failure to prevent the alleged actions of the other district attorney defendants, over whom he does have supervisory authority. However, there has been no allegation of a widespread pattern of prosecutorial misconduct which would give rise to the constructive knowledge in Fitzpatrick necessary to overcome *Rizzo.*

■ The only other possible theories of liability for official inaction against Fitzpatrick would involve either his failure to halt the Wilkinson prosecution (which he allegedly knew was proceeding without probable cause) or his failure to initiate prosecutions against the police (whom he allegedly knew to have committed assaults and batteries against witnesses in the firebombing case). These theories, like the failure-to-supervise theory, are untenable, but for a different reason: they are based on prosecutorial decisions for which *Imbler* clearly mandates absolute immunity, *i. e.,* decisions made in a quasi-judicial capacity. There being no cognizable theory of § 1983 liability against Fitzpatrick, we will grant his motion to dismiss.

## V. *Collateral Estoppel*

Certain defendants contend that Wilkinson is collaterally estopped from claiming that he was physically abused by the Philadelphia police because of a contrary determination in a prior proceeding in the Philadelphia Court of Common Pleas. Specifically, they point to Judge Bonavitacola's finding of fact, at the conclusion of an exhaustive evidentiary hearing on Wilkinson's motion to suppress his confession, that Wilkinson "was not at any time during police interrogation physically abused."

■ The doctrine of collateral estoppel requires (1) that the issue in question be identical to an issue actually litigated in the prior litigation; (2) that the prior litigation have resulted in a final judgment on the merits; and (3) that the party against whom the estoppel is asserted was a party or in privity with a party to the prior adjudication. *See Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 844 (3d Cir. 1974).

■ In *Jones v. Saunders,* 422 F.Supp. 1054 (E.D.Pa.1976), a civil rights action, defendants premised a motion for summary judgment on a theory similar to the one advanced by the defendants in this case. The plaintiff in *Jones* had previously filed a state court motion to suppress relating to the alleged illegality of his arrest. The motion was denied, but he was subsequently acquitted on a directed verdict of not guilty. Defendants argued, as here, that plaintiff was collaterally estopped from raising the question of the legality of his arrest by the state court denial of his suppression motion. Chief Judge Lord, denying defendants' motion for summary judgment, stated:

> A conviction is a final judgment. An order denying a motion to suppress is not; it is interlocutory. An acquitted defendant never has the opportunity to test finally in the state court the propriety of the lower court's ruling. . . . To hold that [he] is estopped would deprive a plaintiff of an opportunity for a definitive determination of important federal rights for the vindication of which the Civil Rights Acts were specifically designed.

422 F.Supp. at 1055.

Wilkinson, like the plaintiff in *Jones,* had no opportunity to test the propriety of the lower court's ruling in his suppression hearing, although for different reasons. Al-

though unlike *Jones* he was subsequently convicted in state court (before he was ultimately exonerated), Wilkinson did win his pre-trial motion to suppress his confession. Judge Bonavitacola found against Wilkinson on the issue of physical coercion, but he also found that Wilkinson's limited mental ability prevented him from fully understanding the nature and consequences of *Miranda* warnings and from being capable of a knowing and intelligent waiver of his rights. It was on this basis that Wilkinson's confession was suppressed. Thus Judge Bonavitacola's finding on physical coercion was not essential to his suppression order, and since Wilkinson won the motion he had no reason to challenge any adverse determination contained in the order.

According to Professor Moore:

[T]he general rule is that a judgment has no conclusive effect adverse to the winning litigant, except insofar as it merges his cause of action if he was the plaintiff. This rule ·is based upon two considerations. First, any adjudication of an issue adverse to a litigant who nonetheless wins on another ground is not a dispositive adjudication, and the judgment that results does not depend upon that adjudication. Second, it would be unjust to conclude the winning litigant as to an issue adjudicated against him because, as the winning litigant, he was unable to seek appellate review. . . .

1B *Moore's Federal Practice* ¶ 0.416[5] at 2302–03 (2d ed. 1974) (footnote omitted). In accordance with this general rule, and for the reasons expressed by Chief Judge Lord in *Jones v. Saunders, supra,* we deny defendants' motion to dismiss Wilkinson's assault and battery claims on grounds of collateral estoppel.

## VI. Claims of Christine Wilkinson and Robert Wilkinson, Jr.

### A. Introduction

Certain of the defendants, citing *Howell v. Cataldi,* 464 F.2d 272 (3d Cir. 1972), urge that Christine Wilkinson and Robert Wilkinson, Jr. are not "legally cognizable parties" to this proceeding. To the extent that defendants' argument is couched in terms of standing and amounts to the contention that Christine and Robert, Jr. cannot assert claims based upon alleged violations of Robert Wilkinson's constitutional rights, we believe it misses the mark. Christine and Robert, Jr. do not assert Wilkinson's rights in this action; rather, they seek to assert their own. Accordingly, the issue is not one of standing; it is whether the claims asserted by Christine and Robert, Jr. are cognizable under § 1983, *i. e.,* whether the allegations of the complaint state claims on behalf of Christine and Robert, Jr. upon which relief can be granted. For the reasons which follow, we believe that Christine's allegations do state a federal claim, but that Robert, Jr.'s do not.

### B. Christine Wilkinson's Claim

■ Christine Wilkinson alleges, *inter alia,* that on October 5, 1975 she was threatened by the police defendants and was told that she would lose custody of Robert, Jr. if she did not sign a statement implicating her husband in the firebombing.[33] Complaint ¶ 24. She contends that these allegations state claims under both federal and state law. Our concern at this juncture is not with the alleged state law claims, but only with whether the complaint states a cognizable federal claim on Christine's behalf.[34] We believe that it does.

---

33. The Complaint does not reveal whether Mrs. Wilkinson ever signed such a statement, although it is alleged that some witnesses were held involuntarily for up to 20 hours, with spouses separated, in order to increase the psychological pressure and to obtain false statements implicating Wilkinson, and that such false inculpatory statements were indeed obtained. Complaint ¶ 26. A decision whether any federally protected right of Christine Wilkinson's was implicated by the alleged police conduct does not, in any event, turn on the effectiveness of the pressure allegedly brought to bear upon her.

34. To the extent that a party has a cognizable federal claim, a federal court has jurisdiction over that party's state law claims arising out of a "common nucleus of operative fact," *see United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), and can make a discretionary determination to exercise that jurisdiction and decide the state

In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court admonished against unduly expanding § 1983, and it may fairly be said that the case stands for the proposition that not every state-inflicted injury gives rise to a cause of action under § 1983. But *Paul* also reaffirms the undisputed principle that a cause of action is created under § 1983 when acts perpetrated under color of state law deprive an individual of a right secured by the Constitution.

The right asserted by Mrs. Wilkinson in this lawsuit may be characterized as a parental right or a right to family integrity. That such a privacy right is fundamental to American jurisprudence has been frequently affirmed by the Supreme Court. *See Parham v. J. L.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The familial right has been asserted under various Constitutional provisions, *see, e. g.,* Mr. Justice Douglas' "penumbra" theory of *Griswold v. Connecticut, supra,* but has recently come to rest rooted in the Fourteenth Amendment's guarantee of personal liberty, *Roe v. Wade, supra,* 410 U.S. at 152–53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147. *See Whalen v. Roe,* 429 U.S. 589, 598–99 n.23, 97 S.Ct. 869, 876 n.23, 51 L.Ed.2d 64 (1977).

If a state regulation had provided that Mrs. Wilkinson must give up either her son or her husband, the choice essentially alleged in the complaint, we would have an easy case. We are dealing here, however, with an isolated threat to remove her son if she refused to implicate her husband, and not with an actual removal. What we must decide is whether such a threat, when made by a police officer, may constitute an intrusion into Mrs. Wilkinson's right of family integrity sufficient to state a cause of action under 42 U.S.C. § 1983. We hold that, under the unique circumstances of this case, it does.

Justice Harlan, dissenting in *Poe v. Ullman*, 367 U.S. 497, 542–43, 81 S.Ct. 1752, 1776, 1777, 6 L.Ed.2d 989 (1961), discussed the Court's function under the Due Process Clause:

> Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. . . . The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. . . .
>
> . . . [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out . . . . It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny . . .

law claims. If a party has no federal claim, and there is no other independent ground of federal jurisdiction, there may not be judicial power to decide the nonfederal or state law claims. *See Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

This passage was quoted with approval by Justice Powell writing for the Court in *Moore v. City of East Cleveland, supra,* at 501–02, 97 S.Ct. at 1936–1937. After a discussion of the pitfalls of the substantive due process doctrine, Justice Powell continued: "Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society.'" *Id.* at 503, 97 S.Ct. at 1937, *quoting Griswold v. Connecticut, supra,* 381 U.S. at 501, 85 S.Ct. at 1690 (Harlan, J., concurring).

Guided by this wisdom, we conclude that, if the facts proved at trial comport with those alleged in the complaint, the actions of the police in questioning Mrs. Wilkinson intruded to a constitutionally impermissible degree into the Wilkinson family's integrity, a value basic to our heritage, and protected by the liberty guarantee of the Fourteenth Amendment. We do not deal here with a police officer's idle or random threat, but rather with what is alleged to have been a colossal intimidation delivered in the midst of a high drama involving the suspects, the police, and the public (the police were under intense public pressure to solve the heinous crime), with potential consequences of the gravest sort for Mrs. Wilkinson's family. By essentially forcing her to choose between her husband and her son, the police officers created a classical Hobson's choice, which must inexorably lead to a psychic family disruption similar in scope to that which would have resulted had the threat been carried out. This the Constitution does not permit, and the motions to dismiss as to plaintiff Christine Wilkinson will be denied.

C. *Robert Wilkinson, Jr.'s Claims*

■ The constitutional protection given the rights asserted by Christine Wilkinson is based at least in part on the central role which Christine herself was forced to play in the disruption of her own family. This analysis does not, in our view, extend to the rights asserted by Robert, Jr., who alleges that the defendants deprived him of his father during the first years of his life. Complaint ¶ 68. While we do not dispute plaintiffs' contention that this deprivation could cause emotional injury and could be highly disruptive of the family unit, we do not believe that the right Robert, Jr. asserts is within the ambit of those familial rights discussed with respect to Christine. Nor do the allegations with respect to Robert, Jr. fall within the unique factual matrix which motivated us to recognize his mother's claim. Rather, Robert, Jr.'s action is in essence one for the false imprisonment of his father—a derivative action not permitted under § 1983. Mindful of the admonition of *Paul v. Davis, supra,* against undue expansion of § 1983, we will grant defendants' motions to dismiss as to plaintiff Robert Wilkinson, Jr.

VII. *Section 1983 Claim Against the City of Philadelphia*

■ In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court overruled prior precedent and held that, in certain situations described *infra,* municipalities could be sued under § 1983. Plaintiffs allege that the City of Philadelphia is liable under federal law because it failed properly to train or control its police officers and has in effect condoned the use of unlawful and brutal police methods by, *inter alia,* openly and repeatedly refusing to discipline or arrest officers who violate the law. Complaint ¶ 59. Plaintiffs also allege that certain Philadelphia police department supervisory officials, including a lieutenant and supervisor in the homicide division (Murray), a captain directly in charge of the homicide division (Patterson), an inspector in charge of all detective operations including those of the homicide division (Golden), and the Commissioner himself (O'Neill) either had knowledge of an ongoing pattern of the use of illegal and abusive methods by the police or were actually present at some or all of the unlawful interrogations alleged in this case. Complaint ¶ 22. The City contends that these allegations do not state a claim under *Monell.* We disagree.

In *Monell* the Court held that while a municipality "cannot be held liable *solely*

because it employes a tortfeasor—or, in other words, a municipality cannot be held liable under 1983 on a *respondeat superior* theory," 436 U.S. at 691, 98 S.Ct. at 2036, it may be sued for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2036. While disclaiming any intention of attempting to delineate the full contours of municipal liability under § 1983, the Court did give some guidance as to the meaning of governmental custom by referring to the definition of custom provided in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970). There Justice Harlan, writing for the Court, defined custom as a persistent practice of state officials which is so well-settled that it has the force of law. He noted that official inaction, at least in the sense of neglecting to enforce laws already on the books, could become so entrenched as to qualify as custom within the scope of § 1983. 398 U.S. at 167 n.39, 90 S.Ct. at 1613 n.39. *See also Nashville, C. & St. L. Ry. v. Browning*, 310 U.S. 362, 369, 60 S.Ct. 968, 84 L.Ed. 1254 (1940), *cited in Monell, supra*, 436 U.S. at 691 n.56, 98 S.Ct. at 2036 n.56.

Applying this principle to the present case, we believe that the complaint states a § 1983 claim against the City of Philadelphia. It alleges the repeated use of brutal and unlawful police methods and the City's refusal, through the acquiescence of a number of the most highly placed supervisory police officials, to enforce existing rules or laws prohibiting such conduct. These allegations are sufficient to state a § 1983 claim against the City.

## VIII. *Pendent Jurisdiction*

The determination whether or not to decide state law claims pendent to the federal claims asserted in this suit is a matter committed to our discretion, to the extent that the claims arise out of a "common nucleus of operative fact" and are such that a plaintiff "would ordinarily be expected to try . . . all in one judicial proceeding." *United Mine Workers v. Gibbs*,

383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *Gibbs* specified three major factors to be taken into consideration by courts considering the exercise of pendent jurisdiction: judicial economy, convenience, and fairness to the litigants. *Id.*, at 726, 86 S.Ct. at 1139. *Hagans v. Lavine*, 415 U.S. 528, 545–46, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974) explains that when these factors are present, *Gibbs* contemplates the federal adjudication of pendent state claims. Consequently, in cases on our docket we have generally exercised our discretion in favor of retaining pendent state law claims in civil rights actions when, as here, such retention advanced judicial economy and convenience, and no unfairness to the litigants appears. We will deny motions by all defendants against whom the plaintiffs have stated a substantial federal claim to dismiss pendent state law claims.

## IX. *Conclusion*

The appended order disposes of all outstanding motions, with the exception of the motions of defendants Haines and Berman to the extent they relate to immunity for alleged activity at the Police Administration Building on October 5, 1975. Decision on these motions is reserved pending discovery and hearing as outlined in § III.D., *supra.*